BOROUGH OF WILKINSBURG,
Petitioner,

v.

## DEPARTMENT OF COMMUNITY AND ECONOMIC DEVELOPMENT,
Respondent.

Commonwealth Court of Pennsylvania.

Argued Feb. 8, 1999.

Decided Feb. 25, 1999.

Publication Ordered April 16, 1999.

**390**

Patricia L. McGrail, Pittsburgh, for petitioner.

Nancy J. Kippenhan, Harrisburg, for respondent.

Before PELLEGRINI, J., KELLEY, J., and JIULIANTE, Senior Judge.

PELLEGRINI, Judge.

The Borough of Wilkinsburg (Borough) petitions for review of an order issued by the Department of Community and Economic Development (Department) and Samuel A. McCullough, Secretary of the Department (collectively, Secretary) terminating its status as a municipality in financial distress.

In 1985, the Borough suffered a financial crisis that culminated in late 1987 with a significant deficit. Due to its lack of funds, the Borough defaulted on payments of principal or interest on some of its bonds or notes or on payment of rental due any authority; missed a payroll for 30 days; accumulated and operated for each of two successive years with a deficit equal to 5% or more of its revenues; and experienced a decrease in a quantified level of municipal service for the preceding fiscal year that resulted from the Borough reaching its legal limit in levying real estate taxes for general purposes.[1] As a result, on January 19, 1988, the Secretary issued an order designating the Borough as a distressed municipality pursuant to the Municipalities Financial Recovery Act (commonly referred to as Act 47)[2] so that the Borough could receive funds from the Secretary in order to continue operating and providing for the health, safety and welfare of its residents. In addition to receiving several loans,[3] pursuant to Section 221(a) of Act 47, 53 P.S. § 11701.221(a), the Secretary appointed Act 47 Coordinator, Michael Foreman, to prepare a recovery plan for the Borough so that it could eventually meet its budget without assistance and regain its non-distressed financial status.

In order to provide the Borough with enough revenue to change its status, from January 1988 through December 1994, the Borough levied an earned income tax of 1.25% on its residents of which it received 0.75% of the tax, and a non-resident earned income tax of 1.2% with the Borough receiving 0.20%.[4] In an effort to wean the Borough from the dependency of the earned income

---

1. Factors that contributed to the Borough's fiscal crisis were its failure to implement accounting software programs; lack of internal management controls; poor budgetary practices; failure to abide by the Borough Manager ordinance; lack of financial management training; and failure to have annual audits completed in a timely and thorough manner in accordance with the Borough Code.

2. Act of July 10, 1987, P.L. 246, 53 P.S. §§ 11701.101–11701.501. Section 102 of Act 47, 53 P.S. § 11701.102, provides that the purpose of the Act is:

   [T]o foster fiscal integrity of municipalities so that they provide for the health, safety and welfare of their citizens; pay due principal and interest on their debt obligations when due; meet financial obligations to their employees, vendors and suppliers; and provide for proper financial accounting procedures, budgeting and taxing practices.

3. The Secretary provided the Borough with an initial emergency loan of $387,000.00 in early 1988 which was then converted into a long term loan of $568,820.00 to resolve outstanding payable issues that continued to mount even after the emergency loan was granted.

4. These amounts were in excess of that which was permitted by the Local Enabling Tax but permissible pursuant to Section 123(c)(1) of Act 47, 53 P.S. § 11701.123, after obtaining the trial court's permission to do so. That section provides:

   After a municipality has adopted a plan under Subchapter C of Chapter 2, it may petition the court of common pleas of the county in which the municipality is located to increase its rates of taxation for earned income, real property, or both, beyond maximum rates provided by law.

taxes it was collecting, in 1995, and at the Secretary's request, the Borough's non-resident earned income tax was eliminated and its resident earned income tax reduced to 1.0% with the borough getting 0.50%. As a result, the Borough would operate without the higher earned income tax for a period of time before the removal of its distress designation, and as of July 1, 1997, the Borough did begin to operate without the benefit of the higher than statutorily permitted earned income tax.

During the first quarter of 1998, the Borough Council realized that its expenditures would exceed its revenues if its current spending patterns continued. In an effort to prevent that eventuality, the Borough reduced its expenses and eliminated equipment and vehicle repairs. Although the Borough alleged that it was still struggling to meet its budget, the Borough's Act 47 Coordinator believed that the conditions that had originally led to the financial distress status were no longer present and requested a public hearing on the proposed removal of the Borough from that designation.[5] A hearing was held on August 18, 1998, at which time the Act 47 Coordinator testified regarding the Borough's current ability to meets its budget requirements. He recommended that the distress status be rescinded because the Borough's accrued deficits had been eliminated, obligations issued to finance all or part of its deficit had been retired, it had operated for the past three years with balanced budgets, and it had eliminated its dependency on the additional revenue generated from the higher rates on the earned income tax.

The Borough's finance director, Eileen Navish, also testified regarding the Borough's budget problems, but in direct contrast to the Act 47 Coordinator's contentions that the budget problems had been resolved. She testified that the deficits of the Borough had not been eliminated and pointed out that due to the result of the change in the earned income tax, money had to be taken from the Borough's general fund/savings account to cover costs of capital improvements. Additionally, based on projections she made, she stated the Borough would have a deficit of $227,000 in 1998 and would grow to a deficit of $1.1 million by the year 2001. She ultimately concluded that the Borough's revenues were relatively flat and its costs continued to increase. Based on these projections, Pamela Macklin, chairperson of the Finance Committee, requested the Secretary to consider an additional two-year extension of the distressed status based on the Borough's projections.

Because the Borough had not yet received a decision from the Secretary, in October of 1998, it authorized its Solicitor to file a petition with the trial court requesting that it be permitted to establish an earned income tax rate of 1.4% on it residents and a rate of 1.3% on its non-residents in an effort to eliminate the projected budget deficit for 1999. A hearing was scheduled for November 18, 1998, but prior to that hearing, however, the Borough received an order from the Secretary dated November 10, 1998, that its financially distressed designation was rescinded. The Secretary primarily relied on the fact that the Borough had an approximate $1 million year-end fund balance from 1997 and had recently received $995,000.00 from the sale of its real estate tax liens to GLS, Inc.

The Borough withdrew its petition from the trial court because the court no longer had authority to grant its request due to the removal of its financially distressed status. It then filed a motion for stay and injunctive relief with this Court requesting that we vacate the Secretary's November 10, 1998 order and reinstate its status as a financially distressed community. A hearing was held on the motion on December 1, 1998, and was denied. However, the Borough's request for

---

5. Prior to this hearing, the recovery plan had been reviewed and recommendations made by the Act 47 Coordinator on several occasions to continue the Borough's distress designation. An initial evaluation took place in 1990, again in 1992, 1993, 1995 and 1996. During those years, the recovery plan was re-evaluated and changes were made to the plan. Also, during those years, the total amount of loans made to the Borough were $955,820.00 and the total grants were $174,250.

an expedited argument was granted and arguments were held on February 8, 1999.[6]

■ The Borough first contends that the Secretary violated Section 203 of Act 47, 53 P.S. § 11701.203, by failing to notify it of his November 10, 1998 decision to rescind its financially distressed designation within 30 days of the public hearing when it provided notification of that rescission approximately 83 days after the hearing took place. However, contrary to the Borough's assertion, Section 203 of Act 47 only provides the procedure that the Secretary is to follow when first determining if a municipality is financially distressed, and the 30–day notice refers to that determination. Specifically, Section 203(f) provides:

Within 30 days after the hearing, the secretary shall issue an administrative determination of whether the municipality is financially distressed and reasons for the determination.

Regarding terminations of such status, Section 253 of Act 47, 53 P.S. § 11701.253(a), provides the procedures that the Secretary must follow in order to terminate a municipality's financial distress status. That section provides:

Following a duly advertised public hearing with notices given as provided in section 203, the secretary may issue a determination that the conditions which led to the earlier determination of municipal financial distress are no longer present. The determination shall rescind the status of municipal financial distress and shall include a statement of facts as part of the final order.

Nowhere in Section 253 is there a 30–day requirement or any requirement that the Secretary issue its decision within a specific time frame. While Section 253 refers to Section 203, it does so only as to the requirements set forth relative to advertising a public hearing after the Secretary has received a request from a municipality to consider whether it is financially distressed. Although the Borough alleges that it was prejudiced by the lengthy delay in receiving notification of the termination of its status because it was unable to properly prepare its 1999 budget by December 31, 1998, the Borough was aware as of August 1998 of its Coordinators' belief that it was time to terminate its status and should have prepared its budget accordingly. As such, because Act 47 does not require the Secretary to issue a notice to the Borough of its terminated financial distress status within 30 days from the date of the hearing, the Secretary did not err by notifying the Borough of his decision 83 days after the hearing.

As to the merits, the Borough contends that the Secretary's decision to rescind its financial distress status constituted an abuse of discretion and an arbitrary execution of his duties and functions because he completely ignored the evidence presented at the hearing and failed to consider the Borough's financial information submitted by its Finance Director, Eileen Navish. Section 253(c) of Act 47 requires the Secretary to consider the following four factors in determining whether the conditions that led to the earlier determination of a municipality's financial distress status remain present:

● Whether monthly reports submitted by the coordinator to the department indicate that termination of the status of municipal financial distress is appropriate. These reports shall contain evidence of payments to creditors as required under the recovery plan; evidence that the loan from the department is being repaid; monthly revenue and expenditure sheets which indicate the balances of each in relation to the other and evidence that the recommendations in the recovery plan are being accomplished by the dates set forth in the plan if applicable.

● Whether accrued deficits in the municipality have been eliminated.

● Whether obligations issued to finance all or part of the municipality's deficit have been retired.

---

**6.** Our scope of review of an administrative agency determination is limited to determining whether constitutional rights were violated, errors of law committed, or whether necessary findings of fact are supported by substantial evidence. 2 Pa.C.S. § 704; *West Reading Tavern, Inc. v. Pennsylvania Liquor Control Board,* 710 A.2d 648 (Pa.Cmwlth.1998).

•Whether the municipality has operated, for a period of at least one year, under a positive current operating fund balance or equity, as evidenced by the municipality's audited financial statements prepared in accordance with generally accepted accounting principles.

In this case, the Borough's Act 47 Coordinator addressed these factors as well as those factors that had led to the Borough's initial financial distress designation. He testified that the Borough had been able to repay almost $2 million in funds due to other funds required in the recovery plan and had also repaid its $568,820.00 Act 47 loan. The Borough also had an excess of revenues over expenditures of $597,524.00 in 1997 and a year-end fund balance of $1,076.771. He also stated that the county sales tax represented a new source of revenue that allowed the Borough to reduce the real estate tax and eliminate higher earned income tax rates. The Act 47 Coordinator further testified that accrued deficits had been eliminated since 1994 and year-end balances for the last four years in the general fund had been positive. Additionally, the Borough had operated with balanced budgets over the last three years. Finally, he stated that the Borough had made significant progress toward improving the overall management and administration of its municipal services during the recovery period of 1987–1998, resulting in improvements in administrative operations, fiscal reporting, accounting practices and capital improvement planning, to name a few areas. Based on all of these factors, the Act 47 Coordinator recommended to the Secretary that the Borough's financial distress status be terminated.

After the hearing took place, the following additional evidence was submitted to the Secretary:

•On September 16, 1998, the Borough consummated a contract with GLS, Inc. to sell real estate tax liens for the period 1950–1997, resulting in a payment of $995,000.00 to the Borough.

•Pursuant to a letter dated October 5, 1998, the Chief of Administration for the CDBG program stated that for 1999, the Borough would receive the same level of funding as it did in 1998—$190,000.00. Also, for years 2000 and 2001, the Borough would still received funding but at a reduced level. By the year 2002, the Borough would have to submit requests for competitive funding as other municipalities did.

•The Borough received a $36,000.00 subsidy from Allegheny County to assist in the underwriting of the Borough's annual costs as a participant in the 9–1–1 dispatch center which the Borough was planning to eventually phase out.

•The Borough projected the elimination of deficit figures provided there was reimbursement of funds, e.g., collection of delinquent parking tickets, municipal service fee collections, etc.

•The Borough Council finance committee agreed that the 1999 annual budget would not include an increase in taxes or fees; there would be a 3.2 mill increase (Fire 1 mill, Recreation 1.7 mills, Debt Service .5 mills), increases in the municipal service fee and other miscellaneous fees; and a 5 mill increase for the General Fund without any fee increases.

Although the Borough's finance director testified as to the bleak projected budgets for 1999, 2000 and 2001 as a result of the reduced earned income tax, the Secretary, relying on the Act 47 Coordinator's testimony, as well as the additional evidence submitted, found that the conditions that led to the distressed status for the Borough no longer existed and it no longer required the financial distress designation.

In effect, the Borough is contending that the Secretary erred in relying upon the Act 47 Coordinator's testimony and disagrees with his interpretation of the evidence. However, the Secretary is the sole fact finder and may weigh and consider all evidence relevant to the proceedings before him. *Borough of Dupont v. Department of Community Affairs*, 141 Pa.Cmwlth. 234, 595 A.2d 688 (1991). It is within his sole discretion to determine whether a municipality's financial distress status is to be terminated. *Id.* Absent bad faith, fraud, capricious action or an abuse of power, we may not inquire into the wisdom of the Secretary's action or into the details or manner of how he executes that action. *Id.* Based upon both the actual

and projected receipt of funds, as well as the Act 47 Coordinator's testimony which the Secretary chose to credit, there was substantial evidence to support his decision. Consequently, the Secretary did not abuse his discretion in terminating the Borough's financial distress status. Accordingly, the decision of the Secretary is affirmed.

## ORDER

AND NOW, this 25th day of February, 1999, the order of the Department of Community and Economic Development and Samuel A. McCullough, Secretary of the Department, dated November 10, 1998, is affirmed.