CITY OF SCRANTON

v.

E.B. JERMYN LODGE NO. 2 OF the FRATERNAL ORDER OF POLICE, the Pennsylvania Department of Community and Economic Development and the Pennsylvania Economy League Central Pa., LLC, as the Act 47 Coordinator for the City of Scranton.

Appeal of: The City of Scranton, Pennsylvania and the Pennsylvania Department of Community and Economic Development, and the Pennsylvania Economy League Central Pa., LLC, as the Act 47 Coordinator for the City of Scranton.

City of Scranton

v.

E.B. Jermyn Lodge No. 2 of the Fraternal Order of Police, Appellant.

Commonwealth Court of Pennsylvania.

Argued June 21, 2010.

Decided Oct. 29, 2010.

See also, 964 A.2d 464, 965 A.2d 359, 995 A.2d 1180, and 2010 WL 4261313.

Clifford B. Levine, Pittsburgh, for designated appellants, PA Department of Community and Economic Development and the PA Economy League Central PA, LLC, as the Act 47 Coordinator for the City of Scranton.

W. Timothy Barry, Pittsburgh, for designated appellant, PA Economy League Central PA, LLC.

Stephen J. Holroyd, Philadelphia, for appellee, E.B. Jermyn Lodge No. 2 of the Fraternal Order of Police.

Richard M. Goldberg, Kingston, PA, for Appellant City of Scranton.

BEFORE: McGINLEY, Judge, and SIMPSON, Judge, and FRIEDMAN, Senior Judge.

OPINION BY Judge SIMPSON.

*Table of Contents*

I.   Introduction ........................................................ 975
II.  Background.......................................................... 975
     A. Distressed Status............................................... 975
     B. 2002 Recovery Plan ............................................. 976
     C. *Scranton FOP (2009)* .......................................... 977
        1. Generally ................................................... 977
        2. Terms of 2006 Award......................................... 978
           a. Expiration of Recovery Plan ............................. 978
           b. Wages ................................................... 978
           c. Health Care ............................................. 978
           d. Police Administration ................................... 979
           e. Other Provisions of Recovery Plan Not Adopted .......... 981
     D. 2009 Award .................................................... 982
        1. Generally ................................................... 982
        2. Wages....................................................... 983
        3. Health Care................................................. 983
        4. Police Officer Safety ....................................... 985
        5. Pension Benefits ........................................... 985
        6. Other Provisions ........................................... 986
     E. Current Appeals ............................................... 986
     F. Appeal Granted in *Scranton FOP (2009)*........................ 986
III. Contentions in Appeals of 2009 Award ............................. 987
IV.  Discussion ......................................................... 987
     A. Violation of Plan and Controlling Law ......................... 987
     B. *IAFF Local 22*; *Ellwood City* ............................... 988
     C. Specific Challenges to 2009 Award ............................. 988
        1. Wages....................................................... 988
           a. Contentions ............................................. 988
           b. Analysis ................................................ 989
        2. Health Care................................................. 990
           a. Contentions ............................................. 990
           b. Analysis ................................................ 991
        3. Police Officer Safety ....................................... 992
           a. Contentions ............................................. 992

      b. Analysis .......................................... 992
   4. Mandatory Cost Containment Provisions ............................ 992
      a. Contentions ...................................... 992
      b. Analysis .......................................... 993
   5. Pension Benefits ................................................ 993
      a. Contentions ...................................... 993
      b. Analysis .......................................... 995
         i. Illegality ...................................... 995
         ii. Act 205–Plan Administrator ...................... 996
         iii. Act 205–Cost Estimate ......................... 996
         iv. Retroactive Adjustment ....................... 997
   6. DROP ......................................................... 997
      a. Contentions ...................................... 997
      b. Analysis .......................................... 997
   7. Vacation of Entire Award ....................................... 997
      a. Contentions ...................................... 997
      b. Analysis .......................................... 998
   8. Remaining Issues .............................................. 999
      a. Constitutionality of Act ........................... 999
         i. Contentions .................................... 999
         ii. Analysis ...................................... 999
      b. Other Issues ...................................... 1000
 VI.  Conclusion ......................................................... 1000

## I. Introduction

In these consolidated appeals originating in a February, 2009, interest arbitration award (2009 Award) involving the City of Scranton (City) and its police personnel, we again examine the effect of the Municipalities Financial Recovery Act (Act 47)[1] on collective bargaining rights under the statute known as the Policemen and Firemen Collective Bargaining Act (Act 111).[2] The City, its allied intervenors,[3] and the E.B. Jermyn Lodge No. 2 of the Fraternal Order of Police (FOP), appeal from an order of the Court of Common Pleas of Lackawanna County (common pleas court)[4] that denied the City's petition to vacate the award, but modified the wage, health insurance benefits and pension provisions of the award. In light of our decisions in and *City of Scranton v. E.B. Jer-*

*myn Lodge No. 2 of the Fraternal Order of Police*, 965 A.2d 359 (Pa.Cmwlth.2009), *appeal granted*, —— Pa. ——, 995 A.2d 1181 (2010) (*Scranton FOP (2009)* ) and *City of Scranton v. Fire Fighters Local Union No. 60, of the International Association of Fire Fighters, AFL–CIO*, 964 A.2d 464 (Pa.Cmwlth.2009), *appeal granted*, —— Pa. ——, 995 A.2d 1180 (2010) (*Scranton Fire Fighters (2009)* ), we affirm the common pleas court's order as modified.

## II. Background

### A. Distressed Status

■ The background in this matter has not changed significantly since our decision in *Scranton FOP (2009)*. In January, 1992, DCED determined the City to be a "financially distressed municipality" under

---

**1.** Act of July 10, 1987, P.L. 246, *as amended*, 53 P.S. §§ 11701.101–11701.501.

**2.** Act of June 24, 1968, P.L. 237, 43 P.S. §§ 217.1–217.10.

**3.** The Pennsylvania Department of Community and Economic Development (DCED) and

the City's Act 47 coordinator intervened before the common pleas court.

**4.** Senior Judge Peter J. O'Brien, formerly a commissioned judge of the Court of Common Pleas of Monroe County, presided.

Act 47 and appointed the Pennsylvania Economy League, LLC, as the City's Act 47 Coordinator (Coordinator), to develop a Recovery Plan.[5] The City is still operating under its third Plan, which it adopted in May 2002 (2002 Recovery Plan). The City remains a financially distressed municipality; DCED has not terminated the City's financially distressed status. *See* Section 253 of Act 47, 53 P.S. § 11701.253 (termination of status); *Borough of Wilkinsburg v. Dep't of Cmty. & Econ. Dev.*, 728 A.2d 389 (Pa.Cmwlth.1999) (it is within sole discretion of the Secretary of DCED to determine whether to terminate a municipality's distressed status).

### B. 2002 Recovery Plan

Chapter II–B of the 2002 Recovery Plan, titled "LABOR RELATIONS, COST CONTAINMENT, AND RELATED PROVISIONS," sets forth specific requirements for the City's employees. It states in part:

> The following are the labor relations, cost containment and related provisions of the [2002 Recovery Plan]. They become effective as of the date of the plan's adoption. *They cover the remainder of 2002 as well as the period 2003–2005 and beyond*; provided that the terms and provisions of any existing collective bargaining agreement shall be followed for the remainder of the current term.
>
> *These cost containment provisions are both reasonable and necessary to the recovery of the City.* It is the intention of the City to negotiate these cost containment provisions with the bargaining unit representative in good faith.
>
> *However, to the extent that the City is unable to reach agreement with any of its Unions, it is the express intention of the City that implementation of these cost containment provisions is mandatory. All cost containment provisions must be addressed.* The only exception to the mandatory intent and nature of these provisions will be by amendment to said provisions, based upon approval

---

**5.** Act 47 provides a procedure by which a municipality may petition DCED for a determination of financially distressed status. Sections 202 and 203 of Act 47, 53 P.S. §§ 11701.202, 11701.203. If DCED determines a municipality is financially distressed, DCED's Secretary must appoint a coordinator to prepare a recovery plan addressing the municipality's financial problems. Section 221, 53 P.S. § 11701.221. The recovery plan must be consistent with applicable law and shall include certain factors relevant to alleviating the municipality's financial distress. Section 241, 53 P.S. § 11701.241. Among the factors a recovery plan may consider are "[p]ossible changes in collective bargaining agreements and permanent and temporary staffing level changes or changes in organization." Section 241(3), 53 P.S. § 11701.241(3). Act 47 mandates that the proposed recovery plan shall proceed through a public response period, following which the municipality may approve the recovery plan or propose an alternative one. Sections 243–46, 53 P.S. §§ 11701.243–11701.246. If the municipality approves the plan, Act 47 requires the coordinator to oversee its implementation. Section 247, 53 P.S. § 11701.247. Neither DCED's Secretary nor the municipality's chief executive officer or governing body may revise the coordinator's recovery plan. Section 244, 53 P.S. § 11701.244. However Act 47 authorizes the coordinator to initiate amendments to the plan after the municipality adopts it. Section 249, 53 P.S. § 11701.249. Once a municipality adopts a recovery plan, it must follow the plan's recommendations or risk such penalties as the withholding or suspension of certain Commonwealth funds. Sections 251 and 264, 53 P.S. §§ 11701.251, 11701.264. Although Act 47 does not authorize a recovery plan to supersede an existing labor agreement, it proscribes any new contract from impairing implementation of the plan. Section 252, 53 P.S. § 11701.252; *Fraternal Order of Police, Fort Pitt Lodge No. 1 v. Yablonsky*, 867 A.2d 658 (Pa.Cmwlth.2005) (*en banc*).

from the Coordinator, in conjunction with [DCED]. Any such change must be in conformance with the financial parameters of the Recovery Plan.

R.R. at 555a (emphasis added). Chapter II–B contains mandatory provisions applying to all City employees, departments, bureaus and offices, R.R. at 555a–62a, provisions specifically for the fire department, R.R. at 562a–65a, provisions specifically for the police department, R.R. at 565a–70a, and provisions for other employees. Act 47 prohibits clear, specific recommendations of a recovery plan from being violated, expanded or diminished. *City of Farrell v. Fraternal Order of Police, Lodge No. 34*, 538 Pa. 75, 645 A.2d 1294 (1994).

Chapter II–C of the 2002 Recovery Plan, titled "GENERAL PLAN PROVISIONS," sets forth the Plan's general provisions for 2002–05 "and beyond." R.R. at 576a. Chapter II–C provides in part (with emphasis added):

> **Employee Benefits/Pensions.** *The City will continue to follow the requirements of Act 205* [6] *particularly as they relate to budgeting the entire cost of the Minimum Municipal Obligation.* The Recovery Plan provides for $800,000 per year to be made as a contribution to the Pension Plans to amortize the cost of the advance payment made by Provident Mutual in the year 2000 to meet the City's unfunded MMO's as of that date. The City shall review on an annual basis in conjunction with the pension actuarial reports the status of this payment and its required MMO payments. *Finally, all pension plan amendments shall be made in accordance with cost contain-*

*ment provisions outlined in Chapter II–B.*

R.R. at 577a (footnote added).

## C. *Scranton FOP (2009)*

### 1. Generally

Pursuant to Act 111, the City and the FOP operate under a collective bargaining agreement (CBA). Their last CBA expired on December 31, 2002. After negotiations for a 2003–2007 CBA reached an impasse, the parties selected an interest arbitration panel to establish the terms and conditions of employment for police personnel.

On April 7, 2006, following extensive hearings and deliberations, a divided arbitration panel issued an interest award (2006 Award) covering the period from January 1, 2003 through December 31, 2007. Among other provisions, the 2006 Award directed retroactive wage increases and lump sum bonuses in excess of the 2002 Recovery Plan's mandates.

In response, the City immediately filed a petition to vacate or modify with the common pleas court. FOP answered and raised new matter.[7] Ultimately, after argument and deliberations, the common pleas court determined the 2006 Award violated the 2002 Recovery Plan and directed modification of the award. The FOP appealed to this Court.

In *Scranton FOP (2009)*, we undertook limited review under a narrow *certiorari* standard. We rejected the argument that Act 47 is an unconstitutional limitation on Act 111 collective bargaining. *See Wilkinsburg Police Officers Ass'n by Harder*

---

**6.** Act of December 18, 1984, P.L. 1005, *as amended,* 53 P.S. §§ 895.101–895.803, officially known as the Municipal Pension Plan Funding Standard and Recovery Act.

**7.** At about the same time, the City filed a similar petition in regard to parallel arbitration involving its fire fighters. *See Scranton Fire Fighters (2009).* The common pleas court handled both petitions together.

*v. Commonwealth,* 129 Pa.Cmwlth. 47, 564 A.2d 1015 (1989), *aff'd,* 535 Pa. 425, 636 A.2d 134 (1993) (*Wilkinsburg I*) (restrictions embodied in Act 47 are constitutional; even if Section 252 of Act 47 operates as a bar to prospective bargaining agreements; it would not violate the Pennsylvania Constitution); *Wilkinsburg Police Officers Ass'n by Harder v. Commonwealth,* 535 Pa. 425, 636 A.2d 134 (1993) (*Wilkinsburg II*) (plurality decision of Supreme Court affirming *Wilkinsburg I;* Act 47 did not unconstitutionally delegate municipality's fiscal authority because municipality retains its fiscal authority; Act 47 is not a prohibited special law regulating labor).

Further, we dismissed the FOP's contention that the arbitration panel could compel the City to amend the 2002 Recovery Plan. Here, the City adopted the Coordinator's three recovery plans. Because the Coordinator developed the 2002 Recovery Plan, only the Coordinator may initiate amendments to it. *Id.*

### 2. Terms of 2006 Award

In *Scranton FOP (2009)*, we reviewed each component of the 2006 Award to determine whether the mandatory requirements of the 2002 Recovery Plan preclude its implementation, and modified the terms of the award to comply with the Plan.

#### a. Expiration of Recovery Plan

First, we rejected the FOP's argument that the 2002 Recovery Plan expired by its own terms on December 31, 2005. We noted that Chapter II–B of the Plan clearly states its labor relations and cost containment provisions apply "for the remainder of 2002 as well as the period 2003–2005 *and beyond.*" *Scranton FOP (2009),* 965 A.2d at 369 (emphasis added). As specified in the 2002 Recovery Plan, "some provisions apply in certain years, while other provisions contain no limit to their duration." *Id.*

#### b. Wages

As to wages, we determined the 2006 Award violated Section II–B(3) of the 2002 Recovery Plan (*"Personnel Costs"*)[8] because it awarded back wages or retroactive adjustments for 2003, 2004, 2005 and part of 2006. *Id.* at 370. However, we rejected the City's contention that specific wage limitations in Section II–B(2) of the Plan (*"Wages"*)[9] for the years 2003–2005 remained in effect indefinitely. *Id.* Accordingly, we modified the common pleas court's orders: to vacate the bonuses for 2003, 2004, and 2005; to vacate the 5.5% wage increase effective December 31, 2005; and, to make the 3.5% wage increase for 2006 effective April 7, 2006, the date of the 2006 Award. *Id.* We confirmed the 4.0% wage increase effective January 1, 2007. *Id.*

#### c. Health Care

As to health care costs, we recognized in *Scranton FOP (2009),* that Section II–B(5) of the 2002 Recovery Plan (*"Health Insurance Benefits"*)[10] capped annual health

---

8. Section II–B(3) of the Plan (*"Personnel Costs"*) provides in part: "Whatever the terms of future collective bargaining agreements, arbitration awards, etc., no back wages or other retroactive adjustments shall be paid." R.R. at 556a.

9. Section II–B(2) of the Plan provides in part: "For 2003, 2004, and 2005, the base hourly wages and salaries of all City employees shall not exceed existing (2002) rates...." R.R. at 556a.

10. Section II–B(5) of the 2002 Recovery Plan provides (with emphasis added):

   *Health Insurance Benefits.* Beginning January 1, 2003, the maximum annual dollar amount which the City will pay to meet all health care costs of any nature shall be $7,191,812 (equal to the City's actual 2001

care costs at $7,191,812, the City's actual 2001 cost to provide these benefits. Section II–B(5) of the Plan also provides for the cessation of health care benefits to City employees who retire on or after January 1, 2003. The 2006 Award increased the existing insurance deductibles and benefits. It also extended health care benefits for a period of five years, effective January 1, 2007, to retiring bargaining unit members eligible to receive such benefits under the 1996–2002 CBA.

We rejected the City's assertion that the 2006 Award's increases in health care benefits violated the maximum health care costs clause. *Scranton FOP (2009)*, 965 A.2d at 482. We noted the City's broad assertion was not supported by the record or clarified by argument. *Id.* The City simply failed to quantify the claimed excess or explain how it could be ascertained. *Id.*

However, we rejected the FOP's argument that the Recovery Plan provision addressing cessation of health care benefits for those retiring after January 1, 2003 lapsed. *Id.* We noted nothing in the plain language of Section II–B(5) limited the duration of the Plan's health insurance provisions. Accordingly, we prospectively modified [11] the common pleas court's or-

ders by substituting the following language: "Effective February 9, 2009, the City will cease to extend health care benefits to employees who retire on or after that date." *Scranton FOP (2009)*, 965 A.2d at 372.

### d. Police Department Administration

As part of the 2006 Award, the arbitration panel majority modified the Strategic Implementation Team Agreement, as amended in 1999 (1999 SIT Agreement), concerning the structure and compensation of the City's Police Department. The "panel majority allowed the City to institute 10–hour shifts, made modifications to the manning schedules, and addressed assignment of detectives, drug and alcohol testing and other assignments and staffing." *Scranton FOP (2009)*, 965 A.2d at 372.

This Court recognized that Section II–B(1) of the 2002 Recovery Plan (*"Management Rights"*) empowers the City to determine the organizational structure of each Department, to determine and change job duties for each position, to determine and change job duties for each employee, and to assign work to each employee.[12] We further recognized that Sec-

---

cost). This amount shall meet all costs relating, but not limited to, medical and major medical, dental, vision, and prescription coverages; administrative costs; and cash payments to individuals that opt not to receive City health benefits and apply to all eligible current employees and their eligible dependents and eligible former employees and their eligible dependents.

. . .

*Effective January 1, 2003, the City will cease to extend health care benefits to employees who retire on or after that date.*
R.R. at 557a–58a.

**11.** In *Scranton FOP (2009)*, 965 A.2d at 372 n. 15, we noted the prospective nature of this modification resulted from the concern for retroactive changes in retirement benefits for

bargaining unit members who retired during the prolonged litigation.

**12.** Section II–B(1) provides (with emphasis added):

*Management Rights.* The City shall have the right to determine the organizational structure and operation of each Department including, but not limited to, the right to determine and change job duties for each position, the right to determine and change schedules for each employee, and the right to assign work to any employee. Any provision in any collective bargaining agreement which is inconsistent with, or interferes with, the rights of the City as set forth above, shall be eliminated to the extent of such inconsistency or interference, and the

tion II–B(1) of the Plan's *"Provisions Specifically for the Police Department,"* titled *"Organizational Structure and Scheduling,"* contains more specific statements as to how the Police Department will be reorganized and how the 1999 SIT Agreement will be modified.[13] *Scranton FOP (2009),* 965 A.2d at 373.

City's management rights, as set forth above, shall not be the subject of any grievance procedure or arbitration clause in any collective bargaining agreement between the City and any of its unions.
R.R. at 555a–56a.

13. Section II–B (1) of the Plan's *"Provisions Specifically for the Police Department,"* titled *"Organizational Structure and Scheduling,"* provides in its entirety:

1. *Organizational Structure and Scheduling.* Scranton Police Department shall be modified organizationally, structurally, and functionally to ensure necessary cost containment, while ensuring the best possible service to the citizens of Scranton. The police department's existing shifts/platoons and the current organizational plan developed by the SIT Committee shall be modified to better reflect the temporal, demographic, and geographical conditions of the City.

Although the present collective bargaining agreement states that the Scranton Police Department shall consist of three "Divisions," the department is in fact comprised of four Divisions: Patrol, Detective, Administrative Support, and Training and Special Services.

*Detective Division.* The current distribution of manpower and supervisory oversight in the Detective Division shall be evaluated to minimize overtime and unnecessary call time. The City shall have the right to determine schedules based on such evaluation. The Director of Public Safety and the Chief of Police shall provide a new detective schedule no later than July 1, 2002 to be effective January 1, 2003. The resulting schedule may be altered at any time with 14 days notice or in case of emergency. A rotational "on call" plan shall be implemented to minimize the current use of overtime time/compensatory time off. No compensatory time off shall be paid to detectives for carrying a pager outside of duty hours.

*Administrative Division.* The Administrative Division consists of one sworn officer (a lieutenant) and a number of clerical positions located throughout the various organizational segments of the police department. These clerical positions shall be placed under the direct control of the organizational division where assigned. The Department's Grant Writer shall fall under the immediate direction, control, and supervision of the Chief of Police. The functional component of the Administrative Division shall be re-evaluated to determine if additional administrative/staff related duties should be included.

*Training and Special Services Division.* The Training and Special Services Division presently consists of two sworn officers—a Captain and a Sergeant. The Training and Special Services Division shall be eliminated and incorporated as a "Section" under the direct supervision of the Administrative Division Lieutenant. *This Section shall consist of a Training Unit and a Special Services Unit.* This change will result in the elimination of the position of "Training Captain" and ensure a more appropriately structured department. Each unit shall consist of one police officer with a rank of not to exceed sergeant. Such action will occur upon the retirement of present Administrative Captain.

*Patrol Division.* The present structure of the Patrol Division consists of three equally manned patrol shifts or platoons. This current method does not achieve a proper balance of manpower according to "shift activity." The current structure shall be changed to reflect the volume of police activity. An assignment schedule shall be designed to place officers on duty according to the amount of police activity and to reflect the functional, spatial, and temporal workload demands.

The present "Highway Unit" located within the Patrol Division shall be eliminated. Accident investigation and related duties shall be incorporated into the regular patrol function of the Division.

According to the International Association of Chiefs of Police, police activity in the average community generally occurs as follows:

22% night shift (12:00 a.m.—8:00 a.m.)
33% day shift (8:00 a.m.—4:00 p.m.)

In *Scranton FOP (2009)*, we rejected the City's argument that the 2006 Award left intact portions of the 1999 SIT Agreement that violated the 2002 Recovery Plan. We noted that the Plan envisioned that the 1999 SIT Agreement remain in effect as modified by Section II–B(1) of the Plan's *"Provisions Specifically for the Police Department."* The Recovery Plan's *"Organizational Structure and Scheduling"* provision made specific structural and scheduling changes. *See Scranton FOP (2009)*, 965 A.2d at 375. In rejecting the City's argument that the 1999 SIT Agreement must be totally abrogated, we noted that the City, the FOP and the Coordinator collaborated to draft the 1999 SIT Agreement, and that the Coordinator would not draft the 2002 Recovery Plan in such a way as to unravel the earlier SIT Agreement. *Id.*

However, we determined the 2006 Award violated the *"Elimination of Minimum Manning"* provision in Section II–B(7) of the 2002 Recovery Plan [14] to the extent it retained the existing minimum manning requirements in the 1999 SIT

Agreement. *See Scranton FOP (2009)*, 965 A.2d at 376.

We also rejected the FOP's argument that Act 47 essentially eliminates collective bargaining. *See Wilkinsburg I and II* (restrictions embodied in Act 47 are constitutional; even if Section 252 of Act 47 operates as a bar to prospective bargaining agreements; it would not violate the Pennsylvania Constitution). Although the FOP will not have the ability to negotiate in the manner it would have if the City had not adopted a recovery plan, the arbitration process is an adequate remedy. *Fraternal Order of Police, Fort Pitt Lodge No. 1 v. Yablonsky*, 867 A.2d 658 (Pa.Cmwlth.2005) *(en banc)*.

### e. Other Provisions of Recovery Plan Not Adopted

In *Scranton FOP (2009)*, we further determined the 2006 Award violated the 2002 Recovery Plan by failing to include the following provisions of the Plan:

- Section II–B (6), titled *"Regular Part-time Employees;"*

---

45% evening shift    (4:00 p.m.—12:00 a.m.)

Currently, manpower distribution in the Scranton Police Department does not reflect the workload. Therefore, the three basic shifts shall be reorganized to better reflect police activity, as well as to improve response time and officer safety. In order to achieve a better balance, a fourth shift or "D" shift may be implemented. In addition, a limited "back drop" method may be employed to ensure adequate coverage at shift change. (The "back drop" method means that one or two patrol officers begin their respective shifts one hour before or after the remainder of their assigned platoon in order to ensure coverage at shift change.) This will also improve response time and result in minimal "shift change" overtime. Accordingly, the City shall have the sole right to determine both shift schedules and manpower per shift. No later than July 1, 2002, the Chief of Police and the Director of Public Safety shall deter-

mine the schedules and manpower requirements to be effective January 1, 2003. Such schedules may be altered at any time with 14 days notice or in case of emergency.
R.R. at 565a–67a.

14. Section II–B(7) provides (with emphasis added):

*Elimination of Minimum Manning. Any provision of any collective bargaining agreement between the City and any of its Unions concerning minimum manning requirements for any particular bargaining unit, shift, platoon, job classification, specialization, or position shall be eliminated. The City shall have the sole right to determine the number of personnel employed and utilized by the City. Further, the City shall have the right to layoff any employees for economic or any other reasons, without limitation.*
R.R. at 559a.

- Section II–B (8), titled *"Clothing Allowance;"*
- Section II–B (9), titled *"Longevity;"*
- Section II–B (10), titled *"Elimination of Subcontracting Clauses;"*
- Section II–B (11), titled *"Duplication of Benefits;"*
- Section II–B (13), titled *"Family Medical Leave Act;"*
- Section II–B (14), titled *"Short-term Disability Insurance;"*
- Section II–B (15), titled *"Workers' Compensation;"*
- Section II–B (16), titled *"Elimination of Past Practices;"*
- Section II–B (17), titled *"Grievance Procedures;"* and,
- Section II–B (21), titled *"Job Descriptions."*

*See Scranton FOP (2009)*, 965 A.2d at 376–77. In addition, we determined the 2006 Award violated the 2002 Recovery Plan by failing to include the following *"Provisions Specifically for the Police Department,"*

- Section II–B (2), titled *"Supervisory Assignments;"*
- Section II–B (3), titled *"Court Time;"*
- Section II–B (4), titled *"Compensatory Time;"*
- Section II–B (5), titled *"Management Positions;"*
- Section II–B (6), titled *"Traffic Maintenance Bureau and Public Safety Mechanics;"*
- Section II–B (7), titled *"Leave Policy;"* and,
- Section II–B (9), titled *"Heart and Lung–Police Officers."*

*See id* at 377. We noted the 2002 Recovery Plan specifically states "to the extent that the City is unable to reach agreement with any of its Unions, resulting in interest arbitration or other legal proceedings, it is the express intention of the City that the implementation of these cost containment provisions is mandatory." R.R. at 555a. Therefore, we modified the common pleas court orders to expressly include those provisions into the Award. *Scranton FOP (2009)*, 965 A.2d at 377.

### D. 2009 Award

#### 1. Generally

In negotiating the terms and conditions of the new CBA to become effective January 1, 2008, the City and the FOP again reached an impasse. As a result, the parties requested interest arbitration proceedings under Act 111. The FOP selected Thomas W. Jennings, Esquire, as their designated arbitrator. The City selected Timothy P. O'Reilly, Esquire, as its designated arbitrator. Arbitrators Jennings and O'Reilly designated Edward J. O'Connell, Esquire, to serve as the panel's impartial chairman.

In lieu of evidentiary hearings, the parties agreed to present their positions and supporting evidence in the form of written submissions to the panel. In addition to the factual submissions, the parties prepared legal memoranda. Thereafter, the panel met in a number of executive sessions and considered the parties' evidence and arguments. In early February, 2009, the arbitration panel majority issued its Award.

The arbitration panel majority issued the 2009 Award a few days before our decision in *Scranton FOP (2009)* and approximately two weeks after our decision in *Scranton Fire Fighters (2009)*. The Award is effective for a seven-year term, starting on January 1, 2008, and continuing through December 31, 2014.

In response, the City filed a petition to vacate the 2009 Award in the common pleas court. In its petition, the City averred the Award diminishes the provi-

sions of 2002 Recovery Plan, and directs the City to violate its obligations under Act 47. The 2009 Award includes the following terms.

## 2. Wages

The 2009 Award contained the following wage increases:

- January 1, 2008—8.0% increase across the board;
- January 1, 2009—3.0% increase across the board;
- July 1, 2009—3.0% increase across the board;
- January 1, 2010—3.0% increase across the board;
- July 1, 2010—3.0% increase across the board;
- January 1, 2011—3.0% increase across the board;
- July 1, 2011—3.0% increase across the board;
- January 1, 2012—3.0% increase across the board;
- July 1, 2012—3.0% increase across the board;
- January 1, 2013—3.2% increase across the board;
- July 1, 2013—3.2% increase across the board;
- January 1, 2014—3.2% increase across the board;
- July 7, 2014—3.2% increase across the board.

*See* 2009 Award, Maj. Op., at 7–8

The panel majority further stated that if any of the wage increases in the 2006 Award were ultimately confirmed:

the wage increases stated above for this bargaining unit will be reduced on a percentage or, part of a percentage basis, accordingly and the reduction shall be spread evenly over the entire term of this Award.

2009 Award, Maj. Op., at 2.

In its petition to vacate the 2009 Award, the City averred the wage increases violate the 2002 Recovery Plan inasmuch as they are retroactive and exceed the Plan's salary mandates.

The common pleas court denied the City's petition to vacate. However, in light of the 2002 Recovery Plan and our decision in *Scranton FOP (2009)*, the court modified the 2009 Award.

Regarding the Award's wage increases, the common pleas court recognized the wage limitations in the 2002 Recovery Plan applied only in the years 2003, 2004 and 2005. However, the common pleas court determined "the attempt by the arbitration panel to retroactively adjust wages by semi-annual increases does violate the recovery plan." Comm. Pleas Ct., Slip Op., 11/18/09, at 4. Accordingly, the court modified the Award by deleting the mid-year increases in the years 2009–2014. As modified, the 2009 Award provided for the following wage increases:

- January 1, 2008—8.0% increase across the board;
- January 1, 2009—3.0% increase across the board;
- January 1, 2010—3.0% increase across the board;
- January 1, 2011—3.0% increase across the board;
- January 1, 2012—3.0% increase across the board;
- January 1, 2013—3.2% increase across the board;
- January 1, 2014—3.2% increase across the board.

Comm. Pleas Ct. Order, 11/18/09, at 1.

## 3. Health Care

Section 3 of the 2009 Award included the following health care provisions:

*Health Insurance.*

. . . .

A.   The City is ordered to fully cooperate with the Health Care Committee by providing all information reasonably necessary to its function and by cooperating with the National Health Care Consultant in the Committee's efforts to contain health care costs.

B.   Effective 30 days after the issuance of this Award, the applicable deductibles and/or copayments shall be adjusted as follows:

1.   The maximum individual annual deductible under the medical insurance plan shall be increased from $200 to $400 for in-network and out-of-network.

2.   The maximum family annual deductible shall be increased from $400 to $800 for in-network and out-of-network.

3.   The per-visit emergency room co-pay shall be increased from $35 to $75.

4.   The per-visit doctor co-pay shall be increased from $5 to $10.

5.   The co-payment for the prescription plan shall be increased to $6 for generics and $15 for brand name drugs.

C.   Article XV, Sections 3(A) and (B) of the collective bargaining agreement shall be amended as follows:

1.   Effective January 1, 2008, the City shall be liable for the cost of health insurance (over and above the listed deductibles and co-payments) up to the annual amounts listed below:

| | 1/1/08 | 1/1/11 | 1/1/12 | 1/1/13 |
|---|---|---|---|---|
| Single [cover.] | $ 4,430 | $ 5,316 | $ 6,380 | $ 7,656 |
| Parent/Child | $ 8,758 | $10,509 | $12,611 | $15,133 |
| Parent/Children | $ 9,443 | $11,331 | $13,598 | $16,317 |
| Husband/Wife | $11,113 | $13,336 | $16,003 | $19,204 |
| Family | $11,920 | $14,304 | $17,164 | $20,597 |

2.   As of January 1, 2008, the City shall be responsible for 50% of any increases in the cost of health care for active bargaining unit employees beyond that provided above and the active employees shall be responsible for the balance of any subsequent increases as determined by the healthcare provider.

D.   Retiree Health Insurance shall be amended as follows: *Effective January 1, 2008, all bargaining unit members who thereafter retire and are eligible to receive retiree health insurance under the 1996–2002 Agreement shall continue to be eligible to receive insurance for a period of 10 years following the bargaining unit member's retirement.*

. . . .

2009 Award, Maj. Op., at 3–4 (emphasis added).

In its petition to vacate, the City averred the adjustments in the applicable deductibles and copayments for individuals and families in Sections 3(B) and (C) of the 2009 Award ignore the 2002 Recovery Plan's express limitation on health care costs. The City further alleged that Section 3(D) of the 2009 Award, which allows certain personnel to retire with health care benefits for 10 years after retirement, also violates the Plan.

The common pleas court rejected the City's argument that the health care provisions in Paragraphs 3(B) and (C) of the Award violate the maximum annual cap in Section II–B(5) of the 2002 Recovery Plan. The court found the record did not support the City's broad assertion.

However, noting our decision in *Scranton FOP (2009)*, the common pleas court determined the retirement health insurance benefits provision in Paragraph 3(D) of the 2009 Award violates the Plan. The court modified Paragraph 3(D) to read as follows: "Effective February 6, 2009 [the date of this Court's Order in *Scranton*

*FOP (2009)* ], the City will cease to extend health care benefits to employees who retire on or after that date." Comm. Pleas Ct. Order, 11/18/2009.

### 4. Police Officer Safety

The 2009 Award included a *"Police Officer Safety"* provision. This provision recognized that the 140 police officer floor in the 1996–2002 CBA must be removed from the contract. However, the 2009 Award continued the 1999 SIT Agreement. The 2009 Award further provided that no police officer shall be required to utilize a City vehicle that would not pass an inspection.

In its petition to vacate, the City averred that the 2009 Award continued the 1999 SIT Agreement without the 2002 Recovery Plan modifications required by this Court in *Scranton FOP (2009)*. The City therefore claimed the *"Police Officer Safety"* provision of the 2009 Award diminishes the 2002 Recovery Plan, and it expands the City's obligations under the Plan contrary to this Court's decision in *Scranton FOP (2009)*.

The common pleas court, however, determined the *"Police Officer Safety"* provision did not in any way violate the 2002 Recovery Plan or our decision in *Scranton FOP (2009)*.

### 5. Pension Benefits

The 2009 Award also amended the police pension plan. Section 7 of the Award (*"Pension Benefits"*) provides:

> The Pension Plan shall be amended to provide for a normal pension to be paid in the following amount of average annual salary:

| Years of Service | Pct. of Average Year Salary |
| --- | --- |
| 20 years | 60 percent |
| 21 years | 62 percent |
| 22 years | 64 percent |
| 23 years | 66 percent |
| 24 years | 68 percent |
| 25 years | 70 percent |

> The calculation of average year salary shall include the longevity, overtime and other pay incentives.

2009 Award, Maj. Op., at 5 (bolding in original, underline added).

The 2009 Award also provided for a DROP[15] benefit: "Any bargaining unit member who retires as of January 1, 2008 shall be entitled to receive a DROP benefit in a manner consistent with similar programs being offered in comparable cities of the third class." 2009 Award, Maj. Op., at 5.

In its petition to vacate, the City averred the pension benefits award lacked support in the record and failed to comply with the requirements of Act 205 and the applicable pension law. The City therefore claimed the pension benefits and DROP provisions violated the 2002 Recovery Plan.

The common pleas court noted the City's arguments. It focused, however, on Section 1(b) of the Act of August 17, 1951, P.L. 1254, *as amended*, 53 P.S. § 30495(b) (1951 Municipal Pension Act; an act fixing the minimum pensions of police officers and fire fighters in certain cities), which provides (with footnote and emphasis added):

---

15. Section 102 of Act 205, 53 P.S. § 85.102, defines a "DROP" as:

A deferred retirement option plan created and operated by a local government or the Pennsylvania Municipal Retirement System under Chapter 11 [of Act 205, added by the Act of September 18, 2009, P.L. 396, 53 P.S. §§ 895.1101–31] or any deferred retirement option plan or similar program established by a local government that provides for the commencement and accumulation of retirement benefit payments for active employees with disbursement of the accumulated payments and interest earnings as a lump sum upon termination of employment.

A city of the second class A [16] may grant a cost of living increase to persons receiving an allowance from either the police or firemen's pension system, by reason of, and after termination of the services of any member of the retirement systems. *The total allowance from the systems shall not exceed one-half of the salary currently paid to a patrolman or fireman of the highest pay grade.*

Based on this provision, the common pleas court modified the 2009 Award to reflect a maximum retirement benefit of 50% of the salary paid to a patrolman of the highest grade.

The common pleas court also determined the 2009 Award preceded the Act of September 18, 2009, P.L. 396, which amended Act 205 by adding Chapter 11, titled "Deferred Retirement Option Plans." *See* Sections 1101–31 of Act 205, 53 P.S. §§ 1101–31. These provisions specifically authorize the City to offer a DROP benefit to its employees. However, they did not become effective until September 18, 2009. Therefore, the common pleas court determined the arbitration panel exceeded its authority under Act 111 in awarding a DROP prior to the effective date of the statutory amendment authorizing such a benefit. Comm. Pleas Ct. Slip. Op., 11/18/2009, at 8–9.

### 6. Other Provisions

The 2009 Award also provided for an increase in life insurance benefits to twice the yearly wage of the bargaining unit member and provided for rank differential of four percent in base wages paid to ranks above Officer. The City did not address these provisions in its petition to vacate, and the common pleas court did not review them in its November, 2009, opinion and order.

16. We note Scranton is the Commonwealth's only city of the second class A.

### E. Current Appeals

■ The City, joined by intervenors DCED and the Coordinator (collectively, the City), and the FOP cross-appeal from the common pleas court's order modifying the 2009 Award. As noted, appellate review of an Act 111 arbitration award is in the nature of narrow *certiorari*. *City of Philadelphia v. International Association of Firefighters, Local 22,* — Pa. ——, 999 A.2d 555 (2010) (*IAFF Local 22* ); *Scranton FOP (2009)*. It is limited to issues regarding: (1) the jurisdiction of the arbitrator; (2) the regularity of the proceedings; (3) whether the arbitrator exceed his powers; and, (4) deprivation of constitutional rights. *Id.*

### F. Appeal Granted in *Scranton FOP (2009)*

In June, 2010, after the City and the FOP filed their appeals from the common pleas court's order modifying the 2009 Award, the Supreme Court granted the FOP's petition for allowance of appeal from our order in *Scranton FOP (2009)* that modified the 2006 Award. *See City of Scranton v. E.B. Jermyn Lodge No. 2 of the Fraternal Order of Police,* — Pa. ——, 995 A.2d 1181 (2010). The Supreme Court granted the FOP's petition with respect to the following issues:

(1) Whether Section 252 of Act 47 applies to Act 111 interest arbitration awards?

(2) If Section 252 applies to Act 111 interest arbitration awards, whether a recovery plan promulgated under Section 252 must be "consistent with applicable law" that recognizes binding arbitration and the right to bargain pursuant to Act 111?

(3) Whether the Commonwealth Court erred in requiring compliance with the recovery plan requiring cessation of healthcare benefits to employees retiring after January 1, 2003?

(4) Whether the Commonwealth Court erred in failing to remand the matter to the Act 111 board of arbitration instead of modifying the interest arbitration award itself?

(5) Whether the Commonwealth Court erred in determining that the City remains distressed under Act 47 and that the recovery plan remains in effect?

*Id.*

## III. Contentions in Appeals of 2009 Award

On appeal in the present case, the City raises three general issues. The City contends the 2009 Award violates our decision in *Scranton FOP (2009)*, the controlling statutes, and the 2002 Recovery Plan. The City further contends the 2009 Award must be vacated in its entirety so that the mandates in *Scranton FOP (2009)* can be considered and incorporated, and that the common pleas court erred in attempting to make only limited modifications to the 2009 Award that did not fully address the controlling mandates of *Scranton FOP (2009)*.

The FOP also raises several issues. First, the FOP contends the common pleas court erred in vacating the mid-year wage increases. Second, the FOP contends the common pleas court erred in determining that the pension benefit improvements in the 2009 Award were unlawful where the City failed to raise the legality of the pension benefits award before either the arbitration panel or common pleas court. Third, the FOP contends Act 47 is either unconstitutional on its face or as applied by the common pleas court.

Additionally, the FOP raises several contentions previously considered and rejected in *Scranton FOP (2009)*. The FOP contends: the common pleas court erred in concluding that Section 252 of Act 47 applies to interest arbitration awards, as opposed to "agreements" or "settlements," as stated in the statute; even assuming Section 252 applies to "awards," a recovery plan must still conform with applicable law regarding mandatory subjects of Act 111 collective bargaining; the common pleas court erred when it eliminated retiree health benefits for employees who were already vested with those benefits; either the City can voluntarily amend the 2002 Recovery Plan to bring it into compliance with the 2009 Award, or an Act 111 interest arbitration award is a mandate to the lawmaking body of the City compelling legislative action such as amendment of the Plan; the City's unclean hands in its failure to comply with many sections of the 2002 Recovery Plan precludes it from seeking enforcement of the Plan in this proceeding; and, even if the Court concludes the 2009 Award is in violation of the 2002 Recovery Plan, the matter should be remanded to the arbitration panel.

## IV. Discussion

### A. Violation of Plan and Controlling Law

The City first contends the 2009 Award, even as modified by the common pleas court, violates the 2002 Recovery Plan, Act 47 and our decision in *Scranton FOP (2009)*. First, Section 252 of Act 47, 53 P.S. § 11701.252 (Plan not affected by certain collective bargaining agreements or settlements) provides:

A [CBA] or arbitration settlement executed after adoption of a plan shall not in any manner violate, expand or diminish its provisions.

Section 252 is a limitation on collective bargaining that does not violate the constitution. *Wilkinsburg II; Int'l Ass'n of Firefighters Local 1400 Chester City Firefighters v. City of Chester,* 991 A.2d 1001 (Pa.Cmwlth.2010) *(Chester Firefighters (2010)); Scranton Fire Fighters (2009); Wilkinsburg I.* An Act 111 arbitration award cannot require an Act 47 municipality to disregard its recovery plan. *City of Farrell; Chester Firefighters (2010); Scranton FOP (2009); Scranton Fire Fighters (2009).* Where an Act 47 coordinator's recovery plan is adopted, the municipality is not empowered to initiate an amendment to it. *Chester Firefighters (2010); Scranton FOP (2009); Scranton Fire Fighters (2009).*

Here, the City asserts, this Court's modifications of the 2006 Award in *Scranton FOP (2009),* which eliminated certain provisions of the Award, and incorporated other provisions to ensure that the 2006 Award did not violate the 2002 Recovery Plan, are controlling. The City thus contends the 2009 Award directly contradicts and defies *Scranton FOP (2009).*

### B. IAFF Local 22; Ellwood City

In addition to *Scranton FOP (2009), Scranton Fire Fighters (2009)* and the law cited therein, this Court finds our Supreme Court's recent decisions in *IAFF Local 22* and *Borough of Ellwood City v. Pennsylvania Labor Relations Board,* —— Pa. ——, 998 A.2d 589 (2010), instructive regarding the review of disputed provisions in an Act 111 interest arbitration award. In particular, in *IAFF Local 22* the Supreme Court stated (with emphasis added):

> Given the General Assembly's intent in passing Act 111, we conclude that, when reviewing a disputed provision in an Act 111 interest arbitration award, a court should first inquire whether the provision concerns a topic that is subject to the right of collective bargaining, *i.e.,* is rationally related to the terms and conditions of employment. *If the topic is so subject, the court should next inquire whether the award also implicates the non-bargainable managerial prerogatives of a public employer. If the award does, the court must then determine whether the award unduly infringes upon the exercise of those managerial responsibilities. If . . . the award unduly infringes upon the exercise of managerial responsibilities, then the award concerns a managerial prerogative that lies beyond the scope of collective bargaining, [the award] reflects an excess of the [arbitration] board's Act 111 powers, and is voidable.*

*Id.* at ——, 999 A.2d at 570–71.

In *Ellwood City,* the Supreme Court recognized that managerial prerogatives falling outside the realm of Act 111 collective bargaining "include, but are not limited to, *'such areas of discretion or policy as the functions and programs of the public employer, standards of services, its overall budget, utilization of technology, the organizational structure, and selection and direction of personnel.'*" *Id.* at ——, 998 A.2d at 599 (emphasis added, citation omitted).

### C. Specific Challenges to 2009 Award

In accord with the statutory and case law discussed above, we review the City's specific challenges to the 2009 Award.

#### 1. Wages

##### a. Contentions

First, the City contends the Wages provision of the 2009 Award, which provides for bi-annual wage increases totaling 45% over seven years, constituted a blatant effort to disregard the prohibition in Section II–B(3) of the Plan (*"Personnel Costs"*),

which provides in part: "Whatever the terms of future [CBAs], *arbitration awards*, etc., no back wages or other retroactive adjustments shall be paid." R.R. at 556a (emphasis added).

The City further contends that in light of this Court's ultimate ruling in *Scranton FOP (2009)* that allowed wage increases of 3.5% in May, 2006, and 4.0% in January, 2007, the large wage increases bestowed by the arbitration panel in the 2009 Award eviscerated any possible fiscal recovery intended by the 2002 Recovery Plan and constituted a return to the pre-recovery plan excesses, in violation of Act 47's "spirit of recovery."

In addition, the City contends the common pleas court's limited modification of the 2009 Award by deleting the mid-year wage increases, without any effort to assess the impact of the 2006 and 2007 wage increases this Court permitted in *Scranton FOP (2009)*, does not cure the 2009 Award's violation of the 2002 Recovery Plan.

In response, the FOP contends, in the absence of any specific recommendations in the 2002 Recovery Plan beyond the year 2005, the wage increases in the 2009 Award must be affirmed. *City of Farrell; Scranton FOP (2009)*. Even accepting the City's argument that the allegedly "excessive" increases are in fact an attempt to compensate workers for the many years they suffered without an increase, the simple fact is that these increases are "prospective." Nothing in the 2002 Recovery Plan expressly prevents them, and that under narrow *certiorari* review, this Court may not disturb the provisions of the 2009 Award merely because it does not agree with them. *Scranton FOP (2009)*.

The FOP also argues that there is nothing out of the ordinary in an award of wage increases broken into steps during the course of a calendar year. By breaking the increase into parts, the City actually benefits, because an increase broken into parts results in a smaller increase for the year. For example, a 6% increase broken into two 3% semi-annual increases results in a 4.5% increase for the year.

#### b. Analysis

In *Scranton FOP (2009)*, we determined that wage increases made for years prior to the year of the 2006 Award were retroactive wage adjustments prohibited by Section II–B(3) of the Plan (*"Personnel Costs"*). *See Scranton FOP (2009)*, 965 A.2d at 370. As for wage adjustments for the year of the 2006 Award, we modified the effective date to be the same as the date of the Award (April 7, 2006). *Id.* The Supreme Court did *not* accept these determinations for appeal. *See Scranton FOP*, 995 A.2d at 1181.

Here, the arbitration panel majority did not issue its Award until February 2, 2009, the date the concurring arbitrator signed the 2009 Award. As a result, the 8% wage increase for the year 2008 constitutes a retroactive wage increase. *Scranton FOP (2009)*. Therefore, the 2008 wage increase violates the prohibition against "back wages or other retroactive adjustments" in Section II–B(3) of the Plan (*"Personnel Costs"*) and must be stricken. *Id.*

Similarly, we hold the 3% wage increase for the year 2009, effective January 1, 2009, must be modified to start as of the date of the 2009 Award (February 2, 2009). *Scranton FOP (2009)*.

However, we reject the City's contentions that the remaining wage increases in the 2009 Award constitute back wages or retroactive adjustments in violation of Section II–B(3) of the Plan. Unlike the lump sum bonuses and wage increases for years that pre-dated the effective date of

the 2006 Award in *Scranton FOP (2009)*, the remaining wage increases in the 2009 Award for the years 2009 through 2014 are *prospective* in operation, regardless of whether they are intended to make up for purported lost ground. Therefore, they do not violate Section II–B(3) of the Plan or this Court's decision in *Scranton FOP (2009)*.

Here, the specific limitations on wage increases in the 2002 Recovery Plan apply only in the years 2003, 2004 and 2005. *Scranton FOP (2009); Scranton Fire Fighters (2009)*. Had the 2002 Recovery Plan intended to impose limitations on wage increases beyond the year 2005, it needed to so specify. It did not. Therefore, we cannot conclude that the 2009 Award's wage increases for the years 2009 through 2014 violate either the 2002 Recovery Plan or controlling law. *City of Farrell; Scranton FOP (2009)*.

We further hold the respected common pleas court erred in deleting the mid-year wage increases for the years 2009 through 2014. In deleting the midyear wage increases, the common pleas court reasoned:

> Since the [2002 Recovery Plan] plan specifically provides that the base hourly wage and salary of all City employees for 2003, 2004, and 2005 shall not exceed existing 2002 rates the attempt by the arbitration panel to retroactively adjust wages by semi-annual increases in ... does violate the recovery plan. On the other hand, the [2002 Recovery Plan] does not preclude the prospective salary increases of a reasonable amount.

Comm. Pleas Ct., Slip. Op., 11/18/2009, at 4. Thus, the common pleas court determined the semi-annual wage increases for the years 2009 through 2014 are actually retroactive to at least 2003.

As discussed above, however, we reject the City's contention that the 2009 through 2014 wage increases violated the 2002 Re-

covery Plan's prohibition against retroactive adjustments, regardless of the motive behind the award. Rather, they are prospective in nature and are not prohibited by any wage limitations in the 2002 Recovery Plan. *Scranton FOP (2009)*. We therefore modify the common pleas court's order to reinstate the mid-year wage increases for the years 2009 through 2014.

Nevertheless, we are mindful that in *Scranton FOP (2009)*, we confirmed the 2006 Award's 3.5% wage increase for 2006 (effective the date of the Award) and the 4% wage increase for 2007. We are also mindful that our Supreme Court will revisit the issue of whether Section.252 of Act 47 properly applies to Act 111 arbitration awards. Accordingly, we direct the parties' attention to the language in the "*Wages*" provision of the 2009 Award stating that:

> *Should any of the wage increases of the 2003–2007 Award ultimately be reinstated and confirmed the wage increases stated above for this bargaining unit will be reduced on a percentage or, part of a percentage basis, accordingly and the reduction shall be spread evenly over the entire term of this Award.*

2009 Award, Maj. Op., at 3 (emphasis added). In accord with the above language, the parties are charged with the responsibility of determining the proper adjustment of the wage increases in the 2009 Award to avoid a windfall for bargaining unit members should the wage increases in the 2006 Award "ultimately be reinstated or confirmed." *Id.*

### 2. Health Care

#### a. Contentions

The 2009 Award included a health care provision very similar to the one in the 2006 Award at issue in *Scranton FOP (2009)*. In that case, we noted Section II–

B(5) of the Plan (*"Health Insurance Benefits"*) caps annual health care costs at $7,191,812 (the City's actual cost to provide these benefits in 2001), but we questioned whether any evidence demonstrated that the 2006 Award's increases in benefits would result in costs in excess of that cap. Therefore, in *Scranton FOP (2009)*, we allowed the increased benefits in the 2006 Award.

The City asserts that in the 2009 Award the arbitration panel majority did not consider the Plan's cap on health care costs or the effect of the increases allowed in the 2006 Award and ultimately confirmed in *Scranton FOP (2009)*. The City argues the 2002 Recovery Plan does more than simply place caps on annual health care costs; it requires the assessment of the costs of the increased benefits as compared to the fiscally distressed City's ability to pay. The City urges the omission of that crucial analysis violates the 2002 Recovery Plan and thus the 2009 Award must be vacated in its entirety.

The City also contends the trial court properly rejected the extension of health care benefits to any retirees in recognition of this Court's clear ruling in *Scranton FOP (2009)*.

In response, the FOP contends the City fails to offer a single specific fact demonstrating that the health care benefit increases exceed the caps imposed by the 2002 Recovery Plan. Nothing in the 2002 Recovery Plan freezes the City's health care obligations regarding union employees. Rather, the 2002 Recovery Plan merely provides a cap on the overall amount. *See* Section II–B(5) (*"Health Insurance Benefits"*); R.R. at 557a–58a. The FOP further argues the 2009 Award increased employee deductibles and co-pays, and given the slight changes in the City's obligation, one is hard pressed to determine just how the 2009 Award violates the 2002 Recovery Plan. The FOP also argues nothing in the 2002 Recovery Plan requires an investigation as to whether the City can pay the increased benefits; and the City points to no provision in Act 47 that requires such an analysis.

However, the FOP acknowledges that the common pleas court's deletion of health insurance benefits for retirees effective February 6, 2009, is consistent with this Court's decision in *Scranton FOP (2009)*. Nonetheless, the FOP stresses that the Supreme Court is now reviewing the issue.

### b. Analysis

■ Our analysis in *Scranton FOP (2009)* and *Scranton Fire Fighters (2009)* is controlling. The City's contention that the FOP health insurance increases exceed the cap is not sufficiently supported by the record. The City again failed to adequately quantify or document its annual healthcare costs, or explain how the claimed excess in healthcare costs may be ascertained.

Section II–B(5) of the Plan (*"Health Insurance Benefits"*) specifies that the $7,191,812 cap:

> shall meet all costs relating, but not limited to, medical and major medical, dental, vision, and prescription coverages; administrative costs; and cash payments to individuals that opt not to receive City health benefits and apply to all eligible current employees and their eligible dependents and eligible former employees and their eligible defendants. *The allocation of this amount to cover eligible recipients shall be fair and equitable and shall generally be in proportion to the actual 2001 costs incurred for each department/bargaining unit.*

R.R. at 557a (emphasis added). However, Section II–B(5) of the Plan does not re-

quire that an arbitration panel perform an independent cost evaluation.

The City had the opportunity to present evidence as to proportionality, but it did not do so. Also, the City had an opportunity to quantify cost increases attributable to the FOP's health care issue positions before the arbitrators, but it did not do so. Absent sufficient evidence of record, we reject the City's contention that the healthcare benefit increases in the 2009 Award violate the cap in Section II–B(5) of the Plan. *Scranton FOP (2009)*; *Scranton Fire Fighters (2009)*.

We further note the FOP acknowledges that the common pleas court's deletion of health care benefits for retirees effective February 6, 2009 is consistent with our decision in *Scranton FOP (2009)*. We therefore make no modifications to the common pleas court's order regarding its treatment of the *"Health Insurance"* provision in the 2009 Award.

### 3. Police Officer Safety

#### a. Contentions

The City next contends the *"Police Officer Safety"* provisions in Section 4 of the 2009 Award violate the 2002 Recovery Plan in the same manner as this Court determined in *Scranton FOP (2009)*. Here, the City asserts these provisions, which maintain the 1999 SIT Agreement in full force and effect, clearly do not incorporate the management rights and minimum manning modifications this Court directed in *Scranton FOP (2009)*. Rather, the common pleas court simply allowed the *"Police Officer Safety"* provisions in the 2009 Award to stand.

In response, the FOP contends this Court rejected a similar argument by the City in *Scranton FOP (2009)* that unidentified portions of the 1999 SIT Agreement restrained management rights in violation of the 2002 Recovery Plan.

#### b. Analysis

Our decision in *Scranton FOP (2009)* is controlling. The Supreme Court did *not* grant an appeal as to this issue. *See Scranton FOP* at ——, 995 A.2d at 1181.

In *Scranton FOP (2009)*, we modified the common pleas court's orders to include the language of Section II–B(1) of the Plan's *"Provisions Specifically for the Police Department,"* titled *"Organization and Scheduling."* We noted the inclusion of these provisions clarifies the relationship between the parties by specifying the modifications to the 1999 SIT Agreement.

Additionally, in *Scranton FOP (2009)*, we modified the *"Police Officer Safety"* provisions in the 2006 Award to delete the minimum manning provisions in Article IX of the 1999 SIT Agreement. We recognized those provisions violated Section II–B(7) of the Plan (*"Elimination of Minimum Manning"*).

In the present case, the common pleas court made no modifications to the *"Police Officer Safety"* provisions in the 2009 Award, which retained the 1999 SIT Agreement in "full force and effect." 2009 Award, Maj. Op., at 4. We therefore modify the common pleas court's order to clarify that the 1999 SIT agreement, *as modified by this Court's order in Scranton FOP (2009)*, remains in effect. More specifically, we modify the common pleas court's order to expressly include the language of Section II–B(1) of the Plan's *"Provisions Specifically for the Police Department,"* titled *"Organization and Scheduling."* We further modify the court's order to delete any minimum manning requirements in the 1999 SIT Agreement. *Scranton FOP (2009)*.

### 4. Mandatory Cost Containment Provisions

#### a. Contentions

Also citing *Scranton FOP (2009)*, the City contends Section II–B of the 2002

Recovery Plan includes extensive cost containment measures set forth in Sections II–B(6) and (8) through (11) inclusive, (13) through (17) inclusive, and (21), which apply to all employees; and Sections II–B(2)–(7) inclusive, and (9) of the Plan's *"Provisions Specifically for the Police Department,"* must be included in the 2009 Award. In *Scranton FOP (2009),* 965 A.2d at 377, we recognized (with citation omitted): "[t]he Recovery Plan states 'to the extent that the City is unable to reach agreement with any of its Unions, resulting in interest arbitration or other legal proceedings, it is the express intention of the City that the implementation of these cost containment provisions is mandatory.' "

Presently, the City argues the arbitration panel majority in the 2009 Award did not account for the inclusion of Sections II–B(6) and (8) through (11) inclusive, (13) through (17) inclusive, and (21); and Sections II–B(2)–(7) inclusive, and (9) of the Plan's *"Provisions Specifically for the Police Department,"* in the 2009 Award. As a result, the parties were not able to bargain with the knowledge that a successor CBA or arbitration award must include these provisions and thus neither party could address the ramifications of these provisions to the Award or CBA as a whole. Therefore, the City argues the 2009 Award was fatally flawed due to its failure to include the mandated cost containment provisions and to use them as a basis for the 2009 Award.

### b. Analysis

▮ In light of *Scranton FOP (2009),* this Court modifies the common pleas court's order here to include the mandatory cost containment provisions in Sections II–B(6) and (8) through (11) inclusive, (13) through (17) inclusive, and (21), of the 2002 Recovery Plan, which apply to all employees; and Sections II–B(2)–(7) inclusive,

and (9) of the Plan's *"Provisions Specifically for the Police Department."* Further, as discussed below, although the City contends the 2009 Award must be vacated in its entirety because the panel majority failed to consider these mandatory provisions, we believe a remand to the divided arbitration panel would be futile. Sufficient modifications can be made to the 2009 Award to bring it into compliance with the 2002 Recovery Plan and move this controversy to the next level.

### 5. Pension Benefits

#### a. Contentions

The City next contends that the *"Employee Benefits/Pensions"* provision in Chapter II–C of the Plan (General Plan Provisions) mandates that any pension plan amendment must comply with the requirements of Act 205 ("Municipal Pension Funding Standard and Recovery Act"), and must be in accord with the cost containment provisions in Chapter II–B of the 2002 Recovery Plan. *See* R.R. at 577a.

▮ Chapter 3 of Act 205 governs minimum funding standards for municipal pension plans. *See* 53 P.S. §§ 895.301– 895.307. Compliance with Act 205 is mandatory. Section 301 provides (with emphasis added):

(a) **Application.**—Notwithstanding any provision of law, municipal ordinance, municipal charter, pension plan agreement or pension plan contract to the contrary, *the applicable provisions of this chapter shall apply to any municipality which has established and maintains, directly or indirectly, a pension plan for the benefit of its employees,* irrespective of the manner in which the pension plan is administered, and to the respective pension plan.

53 P.S. § 895.301(a). Thus, in the event of an actual conflict between Act 205 and a pension plan modification in a CBA, the requirements of Act 205 must be given effect. *Borough of Ellwood City v. Ellwood City Police Dep't Wage and Policy Unit*, 573 Pa. 353, 825 A.2d 617 (2003). Act 205 also applies to pension plan modifications in Act 111 arbitration awards. *Shippensburg Police Ass'n v. Borough of Shippensburg*, 968 A.2d 246 (Pa.Cmwlth. 2009); *Upper Merion Twp. v. Upper Merion Twp. Police Officers*, 915 A.2d 174 (Pa.Cmwlth.2006); *Northampton Twp. v. Northampton Twp. Police Benevolent Ass'n*, 885 A.2d 81 (Pa.Cmwlth.2005).

▇▇▇ Sections 302(b) and (c) of Act 205 require an annual determination of the financial requirements of a municipal pension plan for the following year and describe how the municipality's minimum obligation (MMO) with respect to the pension plan is to be determined. 53 P.S. §§ 895.302(b) and (c). A Section 302 actuarial report must demonstrate that the pension plan is actuarially sound in order for the municipality to determine the impact of the proposed modification on the pension plan's minimum funding requirements. *Ellwood City Police Dep't; Erie v. Int'l Ass'n of Firefighters, Local 293*, 836 A.2d 1047 (Pa.Cmwlth.2003) (*IAFF Local 293*). Section 302(d) requires that the municipality annually provide for the full amount of the MMO in its budget. 53 P.S. § 895.302(d).

Section 305 of Act 205, which requires an actuarial cost estimate for *any* benefit plan modifications, provides in part (with emphasis added):

(a) **Presentation of cost estimate.**— *Prior to the adoption of any benefit plan modification by the governing body of the municipality, the chief administrative officer of each pension plan shall provide to the governing body of the municipality a cost estimate of the proposed benefit plan modification.*

(b) **Defined benefit plan.**—If the pension plan is a defined benefit plan which is self-insured in whole or in part, the cost estimate shall be prepared by an approved actuary and shall either be the updated actuarial exhibits of an actuarial valuation report specified in Chapter 2 or an estimate of the expected actuarial impact attributable to the proposed benefit plan modification.

\*　　　\*　　　\*

(e) **Contents of cost estimate.**—*Any cost estimate of the effect of the proposed benefit plan modification shall be complete and accurate and shall be presented in a way reasonably calculated to disclose to the average person comprising the membership of the governing body of the municipality, the impact of the proposed benefit plan, the modification on the future financial requirements of the pension plan and the future minimum obligation of the municipality with respect to the pension plan.*

53 P.S. §§ 895.305(a), (b) and (e).

The City notes that "a grievance arbitrator who awards a modification of a police pension plan in the absence of an Act 205 cost estimate requires an illegal act necessitating vacation." *Shippensburg Police Ass'n*, 968 A.2d at 251. Because the record in *Shippensburg Police Ass'n* contained no Act 205 cost estimate, the Court determined the arbitrator exceeded his authority in awarding the pension modification. *See also Northampton Twp.* (Act 111 awards modifying police pension plans must be made in compliance with Act 205).

Here, the City asserts that there is no evidence of compliance with the specific requirements of Act 205. The record does not contain a "complete and accurate" cost

estimate or actuarial report, prepared or approved by the City's pension plan administrator (Plan Administrator) [17] regarding the impact of the proposed maximum pension benefit increases, whether to 50% or 70% of average salary.[18] In addition, there is no evidence regarding the significant impact of including "all longevity, overtime and other pay incentives" as part of the salary on which the pension benefit would be based.

Rather, the City contends that the FOP's own actuary, Joseph W. Duda, President of Duda Actuarial Consulting (FOP's Actuary), presented no evidence that the police pension plan was actuarially sound or that it would remain sound despite the proposed modification to the maximum benefits: 70% of average salary at 25 years (70% option). In fact, his report focused solely on the actuarial cost impact of the proposed pension amendments. He did not relate the costs he estimated to the soundness of the plan. He also failed to address the City's future MMO as Act 205 requires, and whether it exceeds the $800,000 MMO cap that Section II–C of the 2002 Recovery Plan ("*Employee Benefits/Pensions*") describes.

The City therefore argues that the arbitration panel's determination that the increased benefits would have an acceptable limited impact is not supportable under Act 205. Rather, it has the effect of requiring an illegal act. *Shippensburg Police Ass'n.* Given the absence of any evidence required by Act 205, the City asserts the common pleas court erred in failing to vacate the 2009 Award.

In response, the FOP contends it provided the actuarial evidence required by Section 305(b) of Act 205, for a defined benefit plan. *See* DUDA ACTUARIAL CONSULTING, CITY OF SCRANTON POLICE PENSION ACTUARIAL STUDY AS OF JANUARY 1, 2007 (2008); R.R. at 400a–04a. Citing Section 305(b) of Act 205 and its actuarial documentation, the FOP contends the record justified the increases in pension benefits. The FOP further contends its actuarial data addresses all the requirements of 53 P.S. § 895.305(e) (contents of cost estimate).

The FOP further argues the $800,000 "cap" referred to in the "*Employee Benefits/Pensions*" provision in Chapter II–C of the 2002 Recovery Plan is not a cap on the City's MMO, but rather the amount per year to pay back a loan by Provident Mutual to cover earlier unfunded MMOs. Even assuming it is a cap, the FOP contends its actuarial data shows that none of the pension improvement scenarios, either the 70% option or the 50% option, increase the City's MMO beyond $800,000.

#### b. Analysis

#### i. Illegality

■ There are four reasons why the modifications to the police pension plan must be vacated. First and foremost, Scranton, a Class 2–A city, is limited to a total pension allowance of 50% of the salary currently paid to a patrolman or fire fighter, highest pay grade. 53 P.S. § 30495(b). As the common pleas court determined, the 2009 Award, in allowing a pension up to 70% of average salary, violated 53 P.S. § 30495(b).

---

17. The City notes its pension plans are governed by a Pension Board with elected members from each of the City's unions. The Plan Administrator is Thomas J. Anderson and Associates, Inc., (Anderson) which is not a City employee. Anderson is an independent municipal pensions consultant which specializes in pension administration.

18. The City notes the existing maximum pension benefit is 50% of average salary. *See* City's Br. at 31.

The FOP does not dispute that the 2009 Award is illegal in this respect; rather, it contends the City waived its legality argument by failing to assert it before the arbitrators. This argument is totally lacking in merit. *Chirico v. Bd. of Supervisors of Newton Twp.*, 504 Pa. 71, 470 A.2d 470 (1983) (arbitrators may not mandate an illegal act; courts may not enforce a provision of an interest arbitration award without a determination of legality; no basis to apply equitable principle of estoppel); *Lee v. Mun. of Bethel Park*, 722 A.2d 1165 (Pa.Cmwlth.1999) (where there is an interest arbitration award, an employer may subsequently assert the illegality of a provision because it did not have an opportunity to do so during the bargaining process; as such, no principles of estoppel existed).

### ii. Act 205–Plan Administrator

■ Second, we conclude the FOP failed to comply with the cost estimate requirements in Section 305 of Act 205. Here, the FOP presented a four-page report from its actuary. It shows the pension plan with approximately *1/3 unfunded liability* of $19,135,558. R.R. at 404a. The unfunded amount *increases* under the FOP's proposed modifications. *Id.* Nevertheless, the FOP's Actuary assumed the City can afford the increase in its estimated MMO from the current $814,243 to $1,483,050 and the estimated City contribution from the current $0 to $527,545. R.R. at 402a, 404a. FOP's Actuary declined to offer any opinion about the legality of the proposed modifications to the pension plan and the addition of a DROP benefit. *Id.* at 403a.

The City presented no actuarial evidence.

Section 305(a) of Act 205 requires the presentation of a cost estimate for benefit plan modification by the chief administra-

tive officer of each pension plan. Section 102 of Act 205, 53 P.S. § 895.102, defines **"chief administrative officer"** as "[t]he person who has primary responsibility for the execution of the administrative affairs of the municipality in the case of a municipality, or of the pension plan in the case of a pension plan, or the designee of that person." While the cost estimate itself must be prepared by "an approved actuary," it is clear that the "chief administrative officer" must be involved in the cost estimate process.

This requirement makes sense. The chief administrative officer is in the best position to approve the actuary and to assess the completeness, accuracy, transparency and legality of the cost estimate. This is especially true where the proposed modification violates a statute. Further a review of the FOP's cost estimate raises questions as to whether "[the cost estimate] is presented in a way reasonably calculated to disclose to the average person comprising the membership of the governing body of the municipality, the impact of the proposed benefit plan, the modification on the future financial requirements of the pension plan and the future minimum obligation of the municipality...." *See* Section 305(e) of Act 205, 53 P.S. § 895.305(e); R.R. at 400a–04a (FOP's Actuary's report).

Because the FOP did not present any evidence from Plan Administrator, their cost estimate procedures do not comply with Section 305(a) of Act 205.

### iii. Act 205–Cost Estimate

Third, the FOP's cost estimate does not clearly address the actuarial soundness of the police pension plan after the proposed modifications. Given the existing 1/3 unfunded liability of $19,135,558, and the increase in the unfunded liability under the

FOP's proposals, this was a fatal omission. *See IAFF Local 293.*

#### iv. Retroactive Adjustment

■ Fourth, to the extent the 2009 Award attempted to modify pension benefits effective January 1, 2008, it violated the prohibition against retroactive adjustments in Section II–B(3) of the 2002 Recovery Plan (*"Personnel Costs "*).

For all the reasons above, the awarded modifications in retirement benefits must be vacated. We therefore modify the common pleas court order to delete the *"Pension Benefit "* provisions in Section 7 of the 2009 Award.

### 6. DROP

#### a. Contentions

The City next contends the common pleas court properly eliminated the DROP from the 2009 Award because the Award, issued in February, 2009, predated the September, 2009, amendments to Act 205 authorizing municipalities to establish a DROP benefit. *See* Sections 1101–31 of Act 205, 53 P.S. §§ 1101–31.

The FOP counters that the arbitration panel majority had the authority to implement a DROP. *See City of Lancaster v. Fire Fighters Local Union No. 319,* 834 A.2d 676 (Pa.Cmwlth.2003) (municipality had implied authority to implement a DROP benefit for its employees; an arbitration panel could impose such a plan in interest arbitration under Act 111). Thus, the FOP argues, there is simply no support for the trial court's conclusion that the DROP benefit must be struck as an "excess of authority."

#### b. Analysis

■ First, we agree with the FOP that the arbitration panel had the authority to implement a DROP regardless of whether the 2009 Award preceded the 2009 amendments to Act 205 adding the DROP provisions. *City of Lancaster;* see also *Borough of Ellwood City v. Ellwood City Police Department Wage Policy Committee,* 2 A.3d 699 (Pa.Cmwlth.2010) (*en banc* ) (2008 interest arbitration award including DROP did not cause municipality to violate the Police Pension Fund Act, Act of May 29, 1956, P.L. (1955) 1804, *as amended,* 53 P.S. §§ 767–778 (Act 600)).

However, the addition of a DROP is a pension plan modification which must also meet Act 205's requirements for an actuarial report indicating the pension plan is actuarially sound and would remain actuarially sound after the DROP is added. *IAFF Local 293.* Further, in *IAFF Local 293,* 836 A.2d at 1052, we noted that Act 205 requires testimony from an actuarial witness that the pension plan "would be actuarially sound after modification of the plan to include the DROP." Here, as in *IAFF Local 293,* the union failed to present the required testimony.

Moreover, as discussed above, the FOP's actuarial report itself failed to satisfy Act 205's cost estimate procedures. Consequently, the DROP modification in the 2009 Award cannot stand. *Shippensburg Police Ass'n; IAFF Local 293.* Therefore, we affirm the common pleas court's deletion of the DROP provision of the 2009 Award on this basis. *Id.*

### 7. Vacation of Entire Award

#### a. Contentions

The City next contends the 2009 Award, issued two weeks after this Court's decision in *Scranton Fire Fighters (2009),* must be vacated in its entirety, because it ignored this Court's ruling and treated the 2002 Recovery Plan provisions as optional. Also, the 2009 Award assumed restoring the bargaining unit members to "parity" with police officers in similarly sized cities

was more important than Act 47's goal of restoring the City to fiscal integrity.

As a result, vacating the 2009 Award in its entirety, with a clear direction of compliance with this Court's mandates, is the only means to ensure a new award complies with the controlling law. The City notes that vacating the 2009 Award is analogous to vacating a jury verdict where the jury was charged with the incorrect law, thus depriving the jury of the essential guidance to decide the case.

The City further argues the common pleas court's piecemeal modification of the 2009 Award failed to vacate or modify other provisions of the Award that violate, expand or diminish the 2002 Recovery Plan. Therefore, the City contends it is essential to fully vacate the 2009 Award. For example, although the common pleas court eliminated the additional mid-year increases, it did not attempt to reconcile those increases with the increases ultimately allowed in *Scranton FOP (2009)*. Thus, it is unclear as to what base wages the increases in the 2009 Award are to be based. The common pleas court also allowed increases in health care costs without considering the increases in health care costs allowed in *Scranton FOP (2009)*.

As to the pension improvements, the common pleas court essentially ignored Act 205's mandatory requirements regarding an assessment of the costs of those benefits, and failed to consider the 2002 Recovery Plan's $800,000 cap on the City's MMO. The common pleas court also made no attempt to evaluate the cost effect of the 2009 Award's inclusion of longevity, overtime and other pay incentives as part of the salary base for calculating the pension benefit.

Further, simply tacking the 2002 Recovery Plan's cost containment provisions onto the 2009 Award, which disregarded them, would not cure the 2009 Award's deficiencies. Therefore, the 2009 Award must be vacated in its entirety.

In response, the FOP counters that the common pleas court may modify an arbitration award where the arbitration panel exceeds its authority. Uniform Arbitration Act, 42 Pa.C.S. §§ 7301–20; *Scranton FOP (2009)*. Further, this Court may modify the orders of the trial court. 42 Pa.C.S. § 706; *Scranton FOP (2009)*.

Here, the FOP asserts, the 2009 Award's provisions regarding wages and health insurance do not violate the 2002 Recovery Plan or Section 252 of Act 47. Therefore, there is no reason for vacating these provisions.

#### b. Analysis

■ Because the parties, or at least their lawyers, are bitterly divided and appear incapable of reaching any agreement, vacating the entire Award and remanding to the same arbitration panel would only postpone the inevitable appeals. In addition, the arbitration panel rendered the 2009 Award *after* our decision in *Scranton Fire Fighters (2009)*. Under the circumstances here, we harbor serious doubts that the same arbitration panel will significantly alter its approach to the 2002 Recovery Plan and Act 47 on remand.

In addition, it may require significant time to reach a new award on remand. Given our application of the 2002 Recovery Plan prohibition against retroactive adjustments, this delay could result in the loss of more wage increases. This possible result would be prejudicial to the FOP, and it is an additional reason supporting our exercise of discretion.

In *Scranton FOP (2009)*, we made sufficient modifications to the common pleas court's orders to bring the 2006 Award into compliance with the 2002 Recovery

Plan and to move the controversy to the next level. The same approach is appropriate here.

### 8. Remaining Issues

### a. Constitutionality of Act 47

#### i. Contentions

We next address the FOP's contention that Act 47 is unconstitutional on its face or as applied by the common pleas court. In this argument, the FOP acknowledges the Supreme Court in *Wilkinsburg II* held Act 47 was constitutional as it did not unconstitutionally delegate a municipality's fiscal authority and was not a special law regulating labor. However, the FOP asserts, *Wilkinsburg II* was a plurality decision and these issues are ripe for reconsideration.

The FOP argues Act 47 contains several provisions that run afoul of Article III, Section 31 of the Pennsylvania Constitution, titled "Delegation of certain powers prohibited," which provides:

> The General Assembly shall not delegate to any special commission, private corporation or association, any power to make, supervise, or interfere with any municipal improvement, money, property or effects, whether held in trust or otherwise, or to levy taxes or perform any municipal function whatever. Notwithstanding the foregoing limitation or any other provision of the Constitution, the General Assembly may enact laws which provide that the findings of panels or commissions, selected and acting in accordance with law for the adjustment or settlements of grievances or disputes or for collective bargaining between policemen and firemen and their public employers shall be binding upon all parties and shall constitute a mandate to the head of the political subdivision which is the employer ... and to the lawmaking body of such political subdivision ... with respect to matters which require legislative action, to take the action necessary to carry out such findings.

PA. CONST. art. III, § 31.

In particular, the FOP argues Section 248, 53 P.S. § 11701.248 (failure to adopt or implement plan), Section 251, 53 P.S. § 11701.251 (withholding of Commonwealth agency payments or assistance), and Section 264, 53 P.S. § 11701.264 (suspension of Commonwealth funding) operate in a way that mandates compliance with plans developed by DCED or its agents. As a result, these sections of Act 47 violate Article III, Section 31 of the Pennsylvania Constitution.

Further, the FOP argues Section 252, 53 P.S. § 11701.252 (CBA or arbitration agreement may not in any manner violate, expand or diminish a preexisting Act 47 recovery plan) violates the prohibition against special laws regulating labor in Article III, Section 32 of the Pennsylvania Constitution, which provides in pertinent part:

> The General Assembly shall pass no local or special law in any case which has been or can be provided for by general law and specifically the General Assembly shall not pass any local or special law:
>
>       *       *       *
>
> 7. Regulating labor, trade, mining or manufacturing....

PA. CONST. art. III, § 32(7).

#### ii. Analysis

These precise arguments were rejected by this Court in *Wilkinsburg I*. Regardless of the effect of Supreme Court's plurality decision in *Wilkinsburg II*, we believe our decision in *Wilkinsburg I* remains controlling on the constitutionality of Act 47.

In any event, we recognize that in *Scranton FOP,* —— Pa. ——, 995 A.2d 1181 (2010), consolidated with *Scranton Fire Fighters,* —— Pa. ——, 995 A.2d 1180 (2010), the Supreme Court decided to revisit the issues of whether Section 252 of Act 47 applies to Act 111 interest arbitration awards and if it does, whether a recovery plan promulgated under Section 252 must be "consistent with applicable law" that recognizes binding arbitration and the right to bargain pursuant to Act 111. *See Scranton FOP* at ——, 995 A.2d at 1181; *Scranton Fire Fighters* at ——, 995 A.2d at 1181.

### b. Other Issues

The FOP, for the purpose of preservation for further appellate review, raises other related issues previously addressed and rejected in *Scranton FOP (2009).* These issues include: whether the common pleas court erred in concluding that Section 252 of Act 47 applies to interest arbitration awards, as opposed to "agreements" or "settlements," as stated in the statute; whether, even assuming Section 252 applies to "awards," a recovery plan must still conform with applicable law regarding mandatory subjects of Act 111 collective bargaining; whether the common pleas court erred when it eliminated retiree health benefits for employees who were already vested with those benefits; whether the City can voluntarily amend the 2002 Recovery Plan to bring the 2009 Award in compliance with the Plan, or alternatively, whether an Act 111 interest arbitration award is a mandate to the lawmaking body of the City compelling legislative action such as amendment of the Plan; whether the City's "unclean hands" in its own failure to comply with many sections of the 2002 Recovery Plan precludes it from seeking enforcement of the Plan in this proceeding; and, whether even if Commonwealth Court concludes the

2009 Award is in violation of the 2002 Recovery Plan, the matter should be remanded to the arbitration panel.

These issues were addressed and rejected in *Scranton FOP (2009).* In accord with our previous decision, we again reject the FOP's contentions. *Id.* With the exception of the "unclean hands" argument, these issues are essentially all before the Supreme Court in *Scranton FOP* and *Scranton Fire Fighters.*

### V. Conclusion

For all the reasons discussed, we affirm the common pleas court's order as modified, consistent with the foregoing opinion.

Judge McCULLOUGH did not participate in the decision in this case.

### *ORDER*

**AND NOW,** this 29th day of October 2010, the order of the Court of Common Pleas of Lackawanna County, entered November 18, 2009 is **AFFIRMED as MODIFIED.** In particular, the Arbitration Award effective February 2, 2009, is modified as follows (with deletions stricken and additions underlined):

1. *Term*

   The modified contract shall be for a term of seven years, starting on January 1, 2008 and continuing through December 31, 2014.

2. *Wages*

   Wages are set forth as follows:

   - ~~January 1, 2008—8% increase across the board;~~
   - ~~January 1, 2009~~ February 2, 2009— 3.0% increase across the board;
   - July 1, 2009—3.0% increase across the board;
   - January 1, 2010—3.0% increase across the board;

- July 1, 2010—3.0% increase across the board;
- January 1, 2011—3.0% increase across the board;
- July 1, 2011—3.0% increase across the board;
- January 1, 2012—3.0% increase across the board;
- July 1, 2012—3.0% increase across the board;
- January 1, 2013—3.2% increase across the board;
- July 1, 2013—3.2% increase across the board;
- January 1, 2014—3.2% increase across the board;
- July 7, 2014—3.2% increase across the board.

### 3. *Health Insurance*

A. The City is ordered to fully cooperate with the Health Care Committee by providing all information reasonable [sic] necessary to its function and by cooperating with the National Health Care Consultant in the Committee's efforts to contain health care costs.

B. Effective 30 days after the issuance of this Award, the applicable deductibles and/or copayments shall be adjusted as follows:

1. The maximum individual annual deductible under the medical insurance plan shall be increased from $200 to $400 for in-network and out-of-network.

2. The maximum family annual deductible shall be increased from $400 to $800 for in-net work and out-of-network.

3. The per-visit emergency room co-pay shall be increased from $35 to $75.

4. The per-visit doctor co-pay shall be increased from $5 to $10.

5. The co-payment for the prescription plan shall be increased to $6 for generics and $15 for brand name drugs.

C. Article XV, Sections 3(A) and (B) of the collective bargaining agreement shall be amended as follows:

1. Effective January 1, 2008, the City shall be liable for the cost of health insurance (over and above the listed deductibles and co-payments) up to the annual amounts listed below:

| | 1/1/08 | 1/1/11 | 1/1/12 | 1/1/13 |
|---|---|---|---|---|
| Single [cover.] | $4,430 | $5,316 | $6,380 | $7,656 |
| Parent/Child | $8,758 | $10,509 | $12,611 | $15,133 |
| Parent/Children | $9,443 | $11,331 | $13,598 | $16,317 |
| Husband/Wife | $11,113 | $13,336 | $16,003 | $19,204 |
| Family | $11,920 | $14,304 | $17,164 | $20,597 |

2. As of January 1, 2008, the City shall be responsible for 50% of any increases in the cost of health care for active bargaining unit employees beyond that provided above and the active employees shall be responsible for the balance of any subsequent increases as determined by the healthcare provider.

D. Retiree Health Insurance shall be amended as follows: ~~Effective January 1, 2008, all bargaining unit members who thereafter retire and are eligible to receive retiree health insurance under the 1996–2002 Agreement shall continue to be eligible to receive insurance for a period of 10 years following the bargaining unit member's retirement.~~ Effective February 6, 2009, the City will cease to extend health care benefits to employees who retire on or after that date.

### 4. *Police Officer Safety*

A. The Panel recognizes that the 140 police officer "floor" contained in the 1996–2002 collective bargaining agreement cannot be continued without the agreement of the City. As the City made it clear that it would not so concur, the Panel acknowledges that the "floor" must be removed from the contract.

However, the current amended SIT Agreement of 1999 as ultimately amended by Commonwealth Court's February 6, 2009 order in City of Scranton v. E.B. Jermyn Lodge No. 2 of the Fraternal Order of Police, 965 A.2d 359 (Pa. Cmwlth.2009), appeal granted, —— Pa. ——, 995 A.2d 1181 (2010) continues in full force and effect.

B. Organizational Structure and Scheduling. Scranton Police Department shall be modified organizationally, structurally, and functionally to ensure necessary cost containment, while ensuring the best possible service to the citizens of Scranton. The police department's existing shifts/platoons and the current organizational plan developed by the SIT Committee shall be modified to better reflect the temporal, demographic, and geographical conditions of the City.

Although the present collective bargaining agreement states that the Scranton Police Department shall consist of three "Divisions," the department is in fact comprised of four Divisions: Patrol, Detective, Administrative Support, and Training and Special Services.

Detective Division. The current distribution of manpower and supervisory oversight in the Detective Division shall be evaluated to minimize overtime and unnecessary call time. The City shall have the right to determine schedules based on such evaluation. The Director of Public Safety and the Chief of Police shall provide a new detective schedule no later than July 1, 2002 to be effective January 1, 2003. The resulting schedule may be altered at any time with 14 days notice or in case of emergency. A rotational "on call" plan shall be implemented to minimize the current use of overtime time/compensatory time off. No compensatory time off shall be paid to detectives for carrying a pager outside of duty hours.

Administrative Division. The Administrative Division consists of one sworn officer (a lieutenant) and a number of clerical positions located throughout the various organizational segments of the police department. These clerical positions shall be placed under the direct control of the organizational division where assigned. The Department's Grant Writer shall fall under the immediate direction, control, and supervision of the Chief of Police. The functional component of the Administrative Division shall be reevaluated to determine if additional administrative/staff related duties should be included.

Training and Special Services Division. The Training and Special Services Division presently consists of two sworn officers—a Captain and a Sergeant. The Training and Special Services Division shall be eliminated and incorporated as a "Section" under the direct supervision of the Administrative Division Lieutenant. This Section shall consist of a Training Unit and a Special Services Unit. This change will result in the elimination of the position of "Training Captain" and ensure a more appropriately structured department. Each unit shall consist of one police officer with a rank of not to exceed sergeant. Such action will occur upon the retirement of present Administrative Captain.

Patrol Division. The present structure of the Patrol Division consists of three equally manned patrol shifts or platoons. This current method does not achieve a proper balance of manpower according to "shift activity." The current structure shall be changed to reflect the volume of police activity. An assignment schedule shall be designed to place officers on duty according to the amount of police activity and to reflect

the functional, spatial, and temporal workload demands.

The present "Highway Unit" located within the Patrol Division shall be eliminated. Accident investigation and related duties shall be incorporated into the regular patrol function of the Division.

According to the International Association of Chiefs of Police, police activity in the average community generally occurs as follows:

22% night shift (12:00 a.m.—8:00 a.m.)

33% day shift (8:00 a.m.—4:00 p.m.)

45% evening shift (4:00 p.m.—12:00 a.m.)

Currently, manpower distribution in the Scranton Police Department does not reflect the workload. Therefore, the three basic shifts shall be reorganized to better reflect police activity, as well as to improve response time and officer safety. In order to achieve a better balance, a fourth shift or "D" shift may be implemented. In addition, a limited "back drop" method may be employed to ensure adequate coverage at shift change. (The "back drop" method means that one or two patrol officers begin their respective shifts one hour before or after the remainder of their assigned platoon in order to ensure coverage at shift change.) This will also improve response time and result in minimal "shift change" overtime. Accordingly, the City shall have the sole right to determine both shift schedules and manpower per shift. No later than July 1, 2002, the Chief of Police and the Director of Public Safety shall determine the schedules and manpower requirements to be effective January 1, 2003. Such schedules may be altered at any time with 14 days notice or in case of emergency.

All minimum manning provisions are eliminated.

### 5. *Rank Differential*

Article VIII(2) of the collective bargaining agreement shall be amended to provide that the base wage paid ranks above that of Officer shall by current category be separated by four percent (4%).

### 6. *Life Insurance*

The face value of the life insurance policy provided to bargaining unit members shall be increased to twice the yearly wage of the bargaining unit member.

### 7. ~~*Pension Benefits*~~

~~The Pension Plan shall be amended to provide for a normal person to be paid in the following amount of average annual salary:~~

| ~~Years of Service~~ | ~~Pct. of Average Year Salary~~ |
| --- | --- |
| ~~20 years~~ | ~~60 percent~~ |
| ~~21 years~~ | ~~62 percent~~ |
| ~~22 years~~ | ~~64 percent~~ |
| ~~23 years~~ | ~~66 percent~~ |
| ~~24 years~~ | ~~68 percent~~ |
| ~~25 years~~ | ~~70 percent~~ |

~~The calculation of average year salary shall include the longevity, overtime and other pay incentives. In this connection, a majority of the Panel notes that the City currently bases its contributions to the Plan on total compensation and agrees with the testimony of the Union's actuary that this change has little actuarial impact on the plan, and so finds as a matter of fact.~~

### 8. ~~*DROP*~~

~~Any bargaining unit member who retires as of January 1, 2008 shall be entitled to receive a DROP benefit in a manner consistent with similar programs being offered in comparable cities of the third class.~~

### 9. *New Provisions*

1. Sections II–B(6), (8) through (11) inclusive, (13) through (17) inclusive, and (21) of the Revised Recovery Plan, which apply to all City employees, are

incorporated by reference into this modified award.

2. Sections II–B(2) through (7) inclusive, and (9) of the Revised Recovery Plan's "Provisions Specifically for the Police Department," are incorporated by reference into this modified award.

\* \* \*

Except as modified by this Award, all other terms and conditions contained in previous awards and written agreements between the parties not modified by this Award shall remain as contained in the 1996–2002 collective bargaining agreement between the parties. If the 2003–2007 Award is upheld by the courts, all other items and conditions contained in the previous awards and written agreements between the parties not modified by this Award shall remain as contained in the 1996–2002 collective bargaining agreement as modified by the 2003–2007 Award.

All other proposals and requests for change submitted by the City and Union, which have not been addressed herein, were considered and denied.

With regard to the various items awarded or denied in this decision, the arbitration panel may not have been in unanimous accord on each; however, at least a majority of the arbitration board has concurred with each awarded item and to the denial of any others not included in this Award.